CENTRAL TRUST CO. OF NEW YORK v. BRIDGES et al.

McBEE et al. v. CENTRAL TRUST CO. OF NEW YORK.

(Circuit Court of Appeals, Sixth Circuit. August 1, 1893.)

No. 88.

1. CIRCUIT COURTS—JURISDICTION—CITIZENSHIP—RAILROAD RECEIVERS—ANCILLARY BILL.
Where a suit is pending in a federal court for the appointment of a receiver and the foreclosure of a railroad mortgage, the court will take jurisdiction, without regard to the citizenship of the parties, of another bill filed by lien claimants, since their right to enforce their liens in the state court will be cut off when the federal court takes possession of the property; and their suit may be regarded as in substance an ancillary bill.

2. RAILROAD COMPANIES—CONTRACTORS' LIENS.
Under the Tennessee statute of March 29, 1883, relating to railroad contractors' liens, the contractor must deal directly with the company in order to secure a lien for his work and material; or, if a subcontractor, he can have no lien unless he serves notice on the railroad company of the principal contractor's failure to pay him, and unless, at the time of such notice, the company shall owe money to the principal on the contract which the subcontractor has helped to perform; and the lien is limited to the amount so due the principal contractor.

3. SAME—CONSTRUCTION OF CONTRACTS—SUBCONTRACTORS.
The fact that one who makes a construction contract with a railroad company is its principal stockholder, and dominates and controls its action, does not render him an agent of the company, so as to make his individual subcontracts in law the contracts of the company, when neither he nor the company hold out to the subcontractors the existence of any such agency, or, as between themselves, had any intention of establishing such agency.

4. SAME.
While construction contracts made by a dominating stockholder with a railroad company for his own benefit are looked upon with suspicion, and frequently condemned by the courts when drawn in question by other stockholders, bondholders, or by the corporation itself, yet their legal existence cannot be questioned by third persons who are not injured thereby, as in the case of subcontractors who dealt with the contractor in his individual character.

5. SAME—VENDOR'S LIEN—CONVEYANCE OF RIGHT OF WAY.
Persons who convey a right of way in Tennessee directly to a railroad company are entitled to a lien for the purchase price prior to that of the mortgage bonds of the company.

6. SAME—CONSTRUCTION CONTRACT—FRAUDULENT JUDGMENT.
The dominant stockholder in a railroad company, having made a construction contract with the company in his individual character, failed to pay his subcontractors. Thereafter, in order to give to the subcontractors and material men a lien on the road under the Tennessee statute of March 29, 1883, their representatives, acting with the principal contractor, and by means of his control over the board of directors, obtained an acknowledgment on the minutes of the company of an amount still due him, vastly more than was really due him, and more than sufficient to cover all the claims. The contractor sued for this amount in a state court, and the company's attorney consented to a judgment therefor. *Held*, that this judgment was fraudulent as against persons injured thereby, and was of no evidential force when the claim was contested by holders of prior mortgage bonds of the company in a foreclosure suit in a federal court.

**7. SAME—RAILROAD MORTGAGES—VALIDITY.**

Two railroads, owned by companies A. and B., were constructed to form one line, and as a common enterprise, the controlling interest in the stock of each being held by the same parties. Company B. agreed with the contractor who built its road to pay him in mortgage bonds at a fixed rate per mile. The bonds actually delivered to and sold by him were, however, issued by company A., but company B. gave a mortgage on its road to secure them. *Held,* that the persons acquiring these bonds had an equitable mortgage on the road, such as would entitle them to contest a fraudulent judgment which gave to subcontractors fictitious liens on the road.

**8. SAME—RIGHTS OF SUBCONTRACTORS—FRAUDULENT CONVEYANCES.**

The subcontractors could not object to the mortgage on the ground that it was given by the railroad when insolvent, and was therefore void under the Tennessee law; for, if they had any claim at all against the company, their claim was a lien prior to the mortgage, and, if they had no claim against the company, but only against the principal contractor, then they had no interest in any disposition the company might make of its property.

**9. SAME—RIGHTS OF GENERAL CREDITORS.**

A general creditor, whose claim came into existence subsequent to the execution of the mortgage, could not object thereto on the ground of an unlawful preference.

**10. SAME—RAILROAD MORTGAGES—LABOR AND MATERIAL CLAIMS.**

The Tennessee statute of 1877, (chapter 72, p. 92,) providing that no railroad company shall have power to execute any mortgage or other lien which shall be valid as against judgments for work and labor done or timbers furnished, etc., applies only when the labor and materials are furnished in such manner that the railroad company would be liable to pay the contractor or material man for them, and not when they are furnished to a principal contractor in his individual capacity, without establishing a lien in the manner prescribed by the Tennessee statute of March 29, 1883; and if, in the latter case, judgments are nevertheless fraudulently obtained against the company, the statute will not prevent a court of equity from disregarding them.

**11. SAME.**

The fact that the money obtained on a draft given by a railroad company to its principal contractor for construction of its road was used by him to pay for labor and material will not create a labor or material man's lien on the railroad in favor of the holder of the draft, it having never been paid.

Appeal from the Circuit Court of the United States for the Eastern District of Tennessee.

In Equity. Suit by the Central Trust Company of New York to foreclose a mortgage given by the Marietta & North Georgia Railway Company. A subsequent suit was brought in the same court by the firm of McBee & Co. and others, seeking to restrain the prosecution of the foreclosure suit and of other claims against the same property, on which they claimed liens, and praying for a sale and payment of their claims from the proceeds. The two suits were consolidated, and all creditors were directed to file their claims in the cause. A motion by the Central Trust Company to dismiss the bill of McBee & Co. for want of jurisdiction was denied. 48 Fed. Rep. 243. Various lien claimants filed intervening petitions. A decree was made for a sale and distribution of the proceeds. The Central Trust Company appeals from so much of the decree as postponed the lien of the mortgage to claims for

construction of the railroad. Cross appeals were taken by lien claimants whose liens were postponed to the mortgage. Decree reversed on complainants' appeal, and cross appeals dismissed.

Statement by TAFT, Circuit Judge:

These are cross appeals from a decree of the circuit court for the eastern district of Tennessee. The decree ordered the sale of a railroad, and established, marshaled, and adjudged priority between the liens thereon. The railroad sold, known as the Knoxville Southern, runs south from Knoxville 90 miles to the North Carolina line, and is a part of the line of the Marietta & North Georgia Railroad Company, a consolidated railway corporation of Georgia and Tennessee. The main controversy in the court below was between the holders of certain mortgage bonds, represented by the Central Trust Company of New York, as trustee under the mortgage, and 50 or more contractors, material men, and others, who had assisted in the construction of the railway. The litigation began in January, 1891, when the Central Trust Company of New York filed a bill of complaint against the Marietta & North Georgia Railway Company, alleged to be a corporation created by and existing under the laws of Georgia and North Carolina, having a railway and owning property and having a place of business in Tennessee, and in the eastern district of Tennessee. The bill sought to foreclose a mortgage given by the Marietta & North Georgia Railway Company in January, 1887, to secure bonds issued on its line of railway constructed and to be constructed in Georgia, North Carolina, and Tennessee. The bill recited that a similar bill had been filed in the northern district of Georgia to foreclose the part of the road which lay in that district.

Several days later, in the same month, McBee & Co., a firm composed of citizens of the state of North Carolina; Wilson, a citizen of North Carolina; and Burgin, also a citizen of the same state,—filed their bill in the same court against the Knoxville Southern Railway Company, a body corporate under and by virtue of the laws of Tennessee; against Eager, a citizen of Massachusetts; and against a number of lien claimants, residents of Tennessee; against the Marietta & North Georgia Railway Company, alleged to be a corporation under the laws of Georgia; the Central Trust Company of New York, and others, none of whom was a resident of Tennessee,—in which they set up mechanics' liens for claims amounting in the aggregate to about $25,-000. They averred that many of the named defendants asserted some interest as subcontractors under George R. Eager, principal contractor, or otherwise, against said Knoxville Southern Railroad; that the said railroad company was insolvent, and that the property was in danger of wasting by reason of many suits brought for the enforcement of liens; referred to the bill above described as already filed by the Central Trust Company; averred the execution of a mortgage by the Knoxville Southern in July, 1890, after the debts due the complainant and some of the defendants were contracted, to secure the bonds sued on in the suit of the Central Trust Company; attacked the mortgage as illegal and a fraud in so far as it attempted to create a mortgage prior or equal to the lien of complainants, and made similar allegations with reference to a subsequent consolidation of the Knoxville Southern Railroad Company and the Marietta & North Georgia Railway Company. The prayer was for a receiver; for an injunction against all the defendants from prosecuting claims to execution against the Knoxville Southern Road and a wasting of its property thereby, and especially against the Central Trust Company's prosecution of its bill of foreclosure; for the determining of the amounts due the several creditors therein set forth, as well as those who might become parties to the bill; for a decree declaring the pretended consolidation of the two roads and the mortgage of 1890, so far as it affected the rights of lien creditors, nullities; and for a decree that the road be sold, and out of the proceeds the complainants and other lien claimants be paid their claims.

It was ordered that these two causes be consolidated on the hearing of a motion for a receiver. A receiver was subsequently appointed. The bill of McBee & Co. was ordered to be treated as an insolvent bill, and all the creditors of the Knoxville Southern or George R. Eager were directed to file their

claims in the cause. Creditors who had already commenced suit in the state courts were permitted to prosecute their suits to judgment, should they so desire, and no further; and the transcripts of judgments thus obtained were directed to be filed as evidence of their claims in the circuit court.

Subsequently the Central Trust Company filed an amended bill, in which it stated that the defendant corporation named in its bill was formed by the consolidation of the Marietta & North Georgia Railway Company, duly chartered under the laws of Georgia, and the Knoxville Southern Railway Company, a corporation duly chartered under the laws of Tennessee, and set out at length the mileage of the defendant corporation, including that of both roads, and prayed as in its bill.

Subsequently the Knoxville Southern Railway Company, the Central Trust Company, and the Marietta & North Georgia Railway Company all answered the bill of McBee & Co., in which they denied that the Knoxville Southern Railway Company was indebted to McBee & Co., denied that the complainants had any lien against the company, and averred that none of the lien claimants made defendants in the bill had a lien prior to that of the Central Trust Company. Thereafter the Central Trust Company moved to dismiss the petition of McBee & Co. for want of jurisdiction, on the ground that when the parties in interest were arranged as parties plaintiff and parties defendant, according to their interest in the controversy, there would be found among the plaintiffs citizens of Tennessee, and among the defendants also a citizen of Tennessee, the Knoxville Southern Railway Company. This motion to dismiss was overruled.

The lien claimants all came in and filed intervening petitions setting up claims against the Knoxville Southern Railway as garnishee, and Eager as principal contractor, in which form their claims had generally been reduced to judgments in the state courts; but afterwards, by amendments, they stated their claims to be against the Knoxville Southern Railway Company as principal debtor. Eager, as principal contractor, filed a claim against the Knoxville Southern Railroad for something more than $370,000, and for a lien for work done and material furnished, and set up a judgment in the state court of Tennessee for this amount against that company. The answers of the Central Trust Company to all these petitions denied any indebtedness due from the Knoxville Southern Railroad to the petitioners, or any lien therefor. The case was referred to a master to take the testimony, to consider the issues, and report upon the claims of all the parties.

The master heard much evidence on the numerous issues raised by the pleadings. He found that the lien claimants, all of them, had made their contracts with Eager as principal contractor, and not with the Knoxville Southern Railroad Company; that nothing was due from the railroad company to Eager on his contract for its construction, but that everything due had been paid; that the judgment in his favor against the company was fraudulently and collusively obtained, and not binding on the Central Trust Company; that the lien claimants were not, therefore, entitled to any lien as subcontractors under the railroad lien law of Tennessee of 1883. But he found that Eager was the principal stockholder of the Knoxville Southern Railroad Company; that the directors were his tools, quick to do his bidding, and that, although the forms of a separate corporate existence were maintained, Eager was so far the company that the contracts of the lien claimants with Eager as principal contractor were in fact with Eager as the agent of the company, an undisclosed principal, and therefore directly with the company; that the lien claimants were entitled, therefore, to claim as principal contractors, and to assert liens as such; that the Central Trust Company mortgage was an equitable lien on the road subordinate to all liens for construction, work, or materials; that certain other lien claimants—as, for instance, banks which had advanced money to contractors and others—did not come within the statute, and must be postponed as general creditors of the railroad company. The circuit court confirmed the master's report, and ordered the road sold, and the proceeds distributed as therein directed. A decree for sale pro confesso had already been entered in favor of the Central Trust Company, on its mortgage, against the Knoxville Southern Railroad Company and the Marietta & North

Georgia Railroad Company. The Central Trust Company appeals from the decree postponing its lien to any claim for construction. The lien claimants who were postponed by the decree to the mortgage debt, as general creditors, filed cross appeals.

The questions raised by the parties can hardly be understood without a somewhat detailed description of the construction of the Knoxville Southern road and of the Marietta & North Georgia Railroad, of which the Knoxville Southern road subsequently became a part. The first Marietta & North Georgia Railroad Company was a corporation of Georgia, and owned and operated a narrow-gauge road, 20 miles in length, from Marietta. In 1881 it became consolidated with the Georgia & North Carolina Railway, of North Carolina, under the name of the Marietta & North Georgia Railroad Company, and the narrow-gauge line was extended to Murphy, N. C. George R. Eager, a railroad contractor, whose home was in Massachusetts, acquired an interest in the second Marietta & North Georgia Railroad Company. As the president and principal stockholder of the North Georgia Construction Company, a corporation of New Hampshire, and also as an individual, Eager made contracts with the Marietta & North Georgia Railroad Company for widening the road to a standard gauge, and increased his stock and interest in the company, so that he soon secured a controlling interest. The plan of Eager and others interested in the Marietta & North Georgia Railroad Company was to extend the line of its road to Knoxville, Tenn., by way of Murphy, N. C. Accordingly, in January, 1887, the Marietta & North Georgia Railroad Company executed a mortgage to the Central Trust Company of New York to secure bonds to be issued at the rate of $16,000 a mile upon its road in Georgia, and at the rate of $20,000 per mile upon an extension of its road from Murphy, N. C., to Knoxville, to be thereafter constructed. The $16,000 a mile on the Georgia & North Carolina part of the line was to be used to take up about $1,200,000 of old indebtedness thereon, and to improve and continue its construction. The grant in the mortgage was of "all the corporate property and franchises of said railway, all and singular, the railway of said company, now completed or hereafter to be completed, extending from Marietta, in Cobb county, Georgia, southerly to the city of Atlanta, Fulton county, in said state of Georgia; also a branch line extending southwesterly from said Marietta to a junction with the Georgia Pacific or the East Tennessee, Virginia and Georgia Railway at or near Austell, in said Cobb county; also extending northerly from said Marietta, through the counties of Cobb, Cherokee, Pickens, Gilmer, and Fannin, in said state of Georgia, to the crossing of the boundary between the states of Georgia and North Carolina, and through the counties of Cherokee, Macon, and Graham, in North Carolina, to the boundary between the states of North Carolina and Tennessee; also through the counties of Monroe, Blount, and Knox to the city of Knoxville, in the state of Tennessee; also a branch line extending from a point on the line above described in Fannin county, Georgia, through said Fannin county, to Ducktown, in Polk county, Tennessee, together with such other branch lines or extensions of said railway in either of said states as the company may be authorized to construct, and which it shall so construct."

The mortgage contained a covenant that the company would do all further acts and make all further conveyances reasonably required for the better and more effectual vesting and confirming of the premises thereby granted or intended to be granted. It was further provided that the bonds should be equally secured by the mortgage, although made at different times. It was further provided that the trustee should have the right to permit the issue of bonds in the proportion and at the rate above stated, upon the completion of the several sections of the railway, and not otherwise; and that the evidence of the completion of any section should be the certificate, sworn to by the engineer of the mortgaging company having in charge the construction of the railway, and delivered to and received by the trustee. This mortgage was recorded in every county through which the Tennessee extension to Knoxville was afterwards built. Some months after the execution of the mortgage it was found that the more practicable plan for extending the Marietta & North Georgia Railroad to Knoxville was from the intersection of the Hia-

wassee river with the North Carolina and Tennessee state line,—a change which did not vary greatly the general direction of the proposed line, though the amended line passed through two or three more counties in Tennessee and two or three less in North Carolina.

During the year 1887 the city of Knoxville offered to subscribe $275,000 to the stock of any road that constructed a line south towards Atlanta, upon which trains should run from Knoxville to Atlanta on or before August 13, 1890. Eager and his associates, in order to secure this subscription, and to extend the Marietta & North Georgia Railroad Company to Knoxville, organized the Knoxville Southern Railroad Company under the laws of Tennessee by a charter dated June 21, 1887. The charter stated the object of the company to be the construction and operation of a railway from Knoxville, Tenn., to connect with the Marietta & North Georgia Railway Company at the state line between the states of Tennessee and North Carolina, in the valley of the Hiawassee river, in Polk county, Tenn., and also to construct and operate a·branch of said railroad from some convenient point in its said line above described to a point in said state line where.the Little river crosses the state line, which is on the line between the counties of Blount and Monroe, in the state of Tennessee, by the most practicable routes between said terminal points, passing through the counties of Knox, Blount, Monroe, and Polk, in said state of Tennessee. The charter provided that the board of directors might fix the amount of the capital stock, and might at any time increase the same if the necessities of the corporation, in their estimation, required it. The corporation was given the right in its charter to borrow money and to issue notes or bonds. on the faith of the corporate property,· and to execute a mortgage or mortgages for the further security of money thus borrowed. The Knoxville Southern Company was organized with friends and employes of Eager as incorporators and directors and officers, though Eager never became anything but a stockholder. At a meeting of the directors of the Knoxville Southern Railroad Company, November 7, 1887, a resolution was adopted, as follows: "That the president be, and he is hereby, authorized to enter into a contract for the building of the road from Knoxville, Tenn., to a connection with the Marietta and North Georgia Railroad, with such person or persons, and on such terms and conditions, as in his judgment he may think for the best interest of the company; said contract, when made, to be ratified by the board of directors and spread upon the minutes."

At a meeting of the stockholders on July 21, 1888, the president reported that satisfactory progress was being made in the construction of the railroad by the.North Georgia Construction Company, with which company a contract had been made to construct and equip the road on or before August 13, 1890. The Knoxville Southern road was built as an extension of the Marietta & North Georgia Railroad, and work was done on the whole line as if it had been one road. The Marietta & North Georgia mortgage bonds were issued on this theory. The Georgia part was first completed. The certificates of the engineer would seem to show that the work on the Knoxville end did not begin until 1889. The contract for the Georgia end was much of it with the Georgia Construction Company, of which Eager was president and principal or sole stockholder; and the work on the Knoxville end was probably done chiefly in the name of Eager as an individual, principal contractor. However this may be, the construction company transferred all its rights and liabilities as contractor to Eager some time· before the labor and construction herein involved were furnished. The work which Eager did in constructing the road he did with the proceeds of the bonds of the Marietta & North Georgia Railroad Company, which he disposed of in London, from time to time, at 10 per cent. discount from their face value.

On the 21st of May, 1890, at a meeting of the board of directors of the Knoxville Southern road, a contract purporting to have been made on the 20th of August, 1887, between the Knoxville Southern Railway Company and George R. Eager, was presented to the board of directors, read, ratified, and ordered spread upon the minutes. The contract was signed for the Knoxville Southern road by A. A. Arthur, vice president, although Arthur was not elected vice president until some time in 1888. The contract by Eager was to build

and complete a railroad commencing at a point on the south side of the Tennessee river, where the road of the Knoxville Belt Railroad Company and the said road connects, within one mile of the city limits of Knoxville, in the state of Tennessee, to a connection with the Marietta & North Georgia near where the Hiawassee crosses the North Carolina and Georgia state line, in accordance with the specifications thereto annexed, upon such route as had been or might thereafter be designated by the party of the first part. By the third section the railroad company agreed to lay out the road, and acquire all necessary real estate by condemnation, and to make application for necessary legislative authority, and to give Eager the right to use the corporate name when necessary. By the fourth section the railroad company agreed that it would execute and cause to be recorded in all counties through which the road was or was to be constructed a first mortgage upon its main and branch lines of railroad then or thereafter to be completed, and its franchises, rolling stock, and all other equipment, to secure the payment of bonds of the railroad, or to secure the bonds of any other railroad company taken or used by Eager as part of his compensation for building the road, or any portion thereof, under this or any other contract; and to execute any other mortgages or instruments which Eager might be advised by counsel might be necessary or proper to secure any first or other mortgage issued to aid in the construction or equipment of said road, or to pay any expenses connected therewith or with the management or operation of the road or the marketing of its securities; such mortgage to be in such form as Eager or his vendees should approve. By the fifth paragraph the railroad company agreed to pay Eager for the work $20,000 in bonds and the same amount in stock per mile, deducting the Knoxville subscriptions and any other individual stock subscriptions. The stock was to be paid as the mile was graded, and the bonds were to be paid as the mile was built and ready for the operation of trains. By the sixth paragraph the company conveyed all its property except its railroad, which it had mortgaged, to Eager as part of the compensation. By the seventh paragraph it was provided that the road should be completed by August 13, 1890. By the eighth paragraph there was a mutual covenant to execute all necessary papers to carry out the contract, and by the ninth paragraph the contract was made binding upon the successors and assigns of both parties. At a meeting of the stockholders, May 21, 1890, this contract was ratified, and a resolution was passed that the company should execute all instruments necessary to fully protect any lien of all first mortgage bonds issued by this or any other company, and taken or used by Eager as compensation for building the road.

At the seventh meeting of the directors, held July 9, 1890, a resolution was passed directing the execution of a mortgage to the Central Trust Company. This mortgage recited the fourth provision of Eager's agreement, stated above; recited that Eager had duly performed the parts of the agreement on his part to be performed; and then stated that, in consideration of the premises, and in order to secure the first lien for the bonds of the Marietta & North Georgia Railroad Company issued or to be issued on account of the construction or equipment of said Knoxville Southern Railroad up to $20,000 per mile, (the terms and effect of which were more particularly described in the indenture of mortgage made between the Marietta & North Georgia Railway Company and the Central Trust Company of New York, bearing date of January 1, 1887, and duly recorded in the counties of Knox, Blount, Monroe, McMinn, and Polk, in the state of Tennessee,) the Knoxville Southern road conveyed and granted to the Central Trust Company all the corporate franchises and property of said company in and to any railroad now completed or hereafter to be completed from a point in or near Knoxville, Tenn., or elsewhere, to a connection with the Marietta & North Georgia Railway Company, together with such other branch lines or extensions of said railway which the company might be authorized to construct, and which it should construct. The defeasance clause was as follows: "Provided, nevertheless, that if said corporation shall well and truly pay the principal and interest of all of the bonds issued and to be issued by the Marietta & North Georgia Railway Company for the construction and equipment of said Knox-

ville Southern road as hereinbefore specified, according to the true intent and meaning of said agreement with said Eager, as particularly specified in said mortgage made by the Marietta and North Georgia Railway Company, and the bonds therein mentioned, then this indenture and the estate hereby granted shall cease and determine."

At the meeting of stockholders, July 11, 1890, whereat 12,051 shares out of 12,053 were represented, a resolution was adopted approving the action of the board of directors in giving the mortgage, and directing the president and secretary to execute the same. The mortgage was executed by the signature of Pulsifer, president, and Bradley, secretary, and by the acknowledgment of Pulsifer, president, and Bradley, treasurer; Bradley being at the time both secretary and treasurer. The evidence seems to show that there was no publication in the daily papers of Knoxville, Nashville, and Memphis of notice that either at the directors' meeting of July 9, 1890, or the stockholders' meeting of July 11, 1890, the question of giving a mortgage upon the property was to be considered, as required by the general statutes of Tennessee. At the meeting of the board of directors on the 22d of November, 1890, there was presented a proposed agreement of union and consolidation between the Knoxville Southern Railway Company and the Marietta & North Georgia Railway Company. The indebtedness of each company was assumed by the consolidated company. A total amount of stock was issued equal to the capital stock of both companies. At the annual meeting of the stockholders, held the 29th of November, 1890, these articles of consolidation were approved, and the road has since been operated under the control of the consolidated company.

All the work done and materials furnished for which liens were claimed, with the exception of those included in the bill of McBee & Co., were furnished to Eager or the North Georgia Construction Company as principal contractor. Substantially all the work and material were furnished in the summer and fall of 1890. The railroad, 90 miles in length, was constructed by Eager, and he received, in accordance with the contract already referred to, $20,000 a mile in bonds of the Marietta & North Georgia Railroad Company. He also received $20,000 a mile in stock as the road was graded, but, as the stock of the Knoxville Southern Railroad Company had been fixed at $1,500,000, there was not enough stock to pay Eager $20,000 a mile. In November, 1890, it became apparent that Eager had not paid about $300,000 of debts contracted by him in the construction of the road, and his creditors were moving to secure themselves. R. N. Hood represented claims against Eager amounting to a large sum. At a meeting of the stockholders of the Knoxville Southern Railroad Company, held November 10, 1890, Hood appeared as the owner of one share, and introduced and moved the adoption of certain resolutions upon the subject of Eager's debts, which, after reciting that there remained due to George R. Eager, on his contract with the Knoxville Southern, the sum of $300,000 of the stock of said company; that Eager had acted at all times for the railroad company in letting contracts to build the road and in making contracts for materials furnished in its construction; that in order to pay Eager this amount it would be necessary to increase the capital stock of the company, which it was not desirable to do; that Eager was the principal and majority stockholder of the Knoxville Southern Railroad Company; that Eager assented to the resolutions, and that the Knoxville Southern desired to honestly and fairly discharge its legal obligations to the contractors for work done and materials furnished in its construction,—finally resolved that the stockholders refuse to increase the capital stock of the company; that Eager, in making contracts for work done and materials furnished was acting for and on behalf of the company, and all contracts made by him were in fact made by the company; that the company acknowledge itself indebted to the persons, firms, and corporations contracting with Eager to the extent of $300,000, and that the same should be settled and paid by the directors in cash. These resolutions were referred to a committee, to make report thereon. At a subsequent meeting the committee reported that the statements in the resolutions that Eager was acting at all times for the Knoxville Southern Company in letting contracts and building the road were not true, but that Eager acted for himself, in

accordance with the contract of August 20, 1887, as an independent contractor. They found due to Eager, however, for extra work, $61,925, and for work done on the permanent line, $40,000, and also $300,000 full value of stock over and above the capital stock of $1,500,000. The committee reported that the company could not, under its charter, issue $300,000 of stock, and they therefore interviewed Eager, and suggested that he take stock in the consolidated company. This he declined to do. The committee reported that they could not agree with Eager as to the valuation of the stock, and that Eager suggested an arbitration on that question, to be left to the presidents of three of the largest banks in Knoxville, their valuation to be conclusive to both parties. At a subsequent meeting, three men,—Hood, Luttrell, and Fisher,—each of whom either had a personal interest as a lien claimant or represented such claimants, reported that their valuation of the $300,000 of stock was $270,000 in cash, whereupon the committee were instructed to settle with Eager upon the basis of their report and this arbitration. As a matter of fact undisputed, the stock of the Knoxville Southern Railroad Company was worthless at this time.

Subsequent to this report, all the lien claimants, except the complainants in the bill of McBee & Co., brought suits in the state courts of Tennessee against Eager as principal contractor and the company as garnishee, to establish a lien against the company on the indebtedness thus owing from the company to Eager, under the mechanic's lien law of Tennessee, passed in 1883. Judgments were allowed to go in favor of these lien claimants. Eager also recovered judgment against the company for $383,764, as due him under the contract. The chief and only evidence of the indebtedness of the Knoxville Southern Railroad Company to Eager in the suits against it as garnishee and in Eager's suit was the admission of this indebtedness as spread upon the minutes of the company in the manner above stated. The attorneys of the railroad company, employed by Bradley, president of the railroad, and one of the settling committee, agreed to the amounts due each plaintiff in these suits, and also to the amount due Eager, as admitted by the stockholders' meeting.

It should be said that when S. B. Luttrell, as the assignee and trustee of Eager for the benefit of his creditors, filed an intervening petition asking for distribution out of the proceeds of the sale of the Knoxville Southern Railroad Company to pay his judgment for $383,764, the Central Trust Company filed an answer defending against the same on the ground that it was obtained by fraud, and that in any event it was not binding on it as the mortgagee and trustee for the bondholders, because recovered in an action to which it was not a party. The company also filed a cross bill against Luttrell, trustee, and Eager, praying the court that the judgment might be set aside as a nullity, on the ground that the same was obtained by fraud and collusion. As already stated, the master reported that there was no actual indebtedness of the Knoxville Southern Railway Company to Eager, and that the judgment in favor of Eager against the railroad company was collusively and fraudulently obtained, and that the said judgment was not conclusive upon the Central Trust Company; but reported that the cross bill of the Central Trust Company, asking to have the judgment set aside, should be disallowed and dismissed.

Butler, Stillman & Hubbard, Henry B. Tompkins, and Tillman & Tillman, for appellant.

Washburn & Templeton, Greene & Shields, J. W. Caldwell, and Hood & Cates, for appellee.

Before JACKSON and TAFT, Circuit Judges, and BARR, District Judge.

TAFT, Circuit Judge, after stating the facts as above, delivered the opinion of the court:

The Central Trust Company, after answering the bill of McBee & Co., challenged the jurisdiction of the circuit court to entertain

it, by a motion to dismiss, and the denial of its motion is one of its assignments of error. The jurisdiction was sustained by Judge Key in the court below on the ground that the bill was ancillary to the bill of the Central Trust Company against the Marietta & North Georgia Railway Company. It was said by him that, as the bill of the Central Trust Company prayed the court to take possession of and sell the property in which McBee and other lien claimants asserted an interest, and thus prevented the latter from pursuing their usual remedy against the property in the state courts, they must have the right to appeal to the federal court to save their rights and protect their interests, either by enjoining the trust company from proceeding under its bill, or by adjusting priorities between them and the trust company, even if the lien claimants, as between themselves and the Knoxville Southern Railroad Company, might not have had the requisite citizenship to entitle the court originally to take jurisdiction of McBee's bill as an independent bill in equity. We think this was a correct view of the law under the decisions both of the circuit and supreme courts of the United States. See Conwell v. Canal Co., 4 Biss. 195; Minnesota Co. v. St. Paul Co., 2 Wall. 609; Krippendorf v. Hyde, 110 U. S. 276, 4 Sup. Ct. Rep. 27; Pacific R. Co. v. Missouri Pac. Ry. Co., 1 McCrary, 647, 3 Fed. Rep. 772.

By the consolidation, McBee & Co. and the other lien claimants were put in the position of interveners in the original action brought by the Central Trust Company. Certainly, in that capacity, the circuit court for the eastern district of Tennessee would have jurisdiction to consider their claims. It comes with a bad grace from the Central Trust Company to object to the jurisdiction of the federal court to do equity to lien claimants in respect to property which by its own application has been taken into the custody of that court, and out of the reach of lien claimants, by ordinary process in the state courts. It is by no means clear that the bill of McBee & Co. could not be considered by the federal court as an independent bill; but, as the jurisdiction can be sustained on the ground already stated, it is unnecessary to consider the bill in this aspect.

The liens of the contractors and material men are asserted under an act of the legislature of Tennessee, passed March 29, 1883. The first section of the act provides that when a railroad company contracts with any person to construct or repair any part of its railroad, or to furnish material for such construction or repair, or to superintend the same, the person so contracted with shall have a lien for the amount of the debt thus contracted for and incurred, to continue in force for six months after the performance of the work or the delivery of the material, and until the termination of any suit commenced within the six months for its enforcement. The second section directs in what courts, how, and in what manner, the suit shall be brought to enforce the lien conferred in the first section. The third section of the act provides that when "any principal contractor [by which is meant one who contracts directly

with the railroad companies] shall refuse to pay any subcontractor, material man or other person employed by him to assist in the fulfillment of his contract, such subcontractor or other person may, by giving notice to the railway company of this fact, and the amount and value of the material and labor furnished, bind any amount (not exceeding the amount claimed) then due and owing from the company to the principal contractor, and the amount so claimed shall be a lien in favor of the claimant superior to all others, to continue ninety days from the service of such notice and until the termination of a suit begun within the ninety days to enforce it." Provision is made for the railway company to relieve itself, if sued by the principal contractor, by paying the amount claimed into court, where the contractor and subcontractor, duly summoned, shall try the issue between them. The claim provided in this section may be enforced by the subcontractor or other person by suit against the principal contractor as debtor and the railway company as garnishee. The fourth section makes provision for the employes of the subcontractors, and permits them, in a prescribed way, to acquire a lien on the debts due from the principal contractor to the subcontractor.

Under this law, the contractor must deal directly with the company to secure a lien for his work or material, or, if a subcontractor, then he can have no lien on the railroad, unless at the time that or after he serves notice of his claim upon the company the company shall owe money to his principal on the contract which his subcontract has helped to perform; and his lien is limited to the amount so due and owing to his principal. In other words, the security of the subcontractor is the balance due the principal contractor from the company when the company receives notice of the subcontractor's claim, and, after notice is given, the lien of the subcontractor is transferred from the balance due on the contract to the corpus of the railroad, pro tanto; but, if there is no balance due on service of the notice, there can be no lien.

In the consideration of the liens adjudicated below two questions, therefore, arise: First, did the lien claimant deal directly with the company, as principal contractor? Second. If the lien claimants were subcontractors under Eager as principal contractor, was there any sum due Eager, as such principal contractor, from the Knoxville Southern Railroad Company, after the company was notified by the subcontractors of their intention to claim liens?

1. The theory upon which the master and the learned court below held that all the intervening petitioners dealt directly with the Knoxville Southern Railroad Company as principal contractors was that Eager was an agent of the railroad company in making the contracts. One may be liable for the acts of another as his agent on one of two grounds: first, because by his conduct or statements he has held the other out as his agent; or, second, because he has actually conferred authority on the other to act as such. The master reported to the court below that in no case did Eager, under or in the name of the Knoxville Southern Railroad

Company, make any contract with any one doing work or furnishing material for the road; that the men who contracted with Eager knew very little of Eager, saw him only occasionally, made no inquiry into his real relation to the company, what interest he had in it, or how he obtained money to carry on the work. In substance, the master reported that the intervening petitioners believed that they were dealing with Eager as principal contractor. The proof fully sustains this conclusion. All the estimates introduced in evidence upon which payments were made, bear the name of Eager as principal contractor, and every circumstance in the case rebuts the idea that the intervening petitioners either believed or had reason to believe that they were doing their work or furnishing their material to the company instead of to Eager. The most conclusive evidence on this point is that nearly every one of the intervening petitioners subsequently brought suit and recovered judgment on his claim in the state court against Eager as principal contractor and against the company as garnishee. It is said that this does not estop the lienholders from showing that Eager was actually the agent of the company, because Eager and the company had fraudulently misled them into thinking that there was no such relation of agency between him and the company. Conceding that no estoppel arises from the judgments, they have great probative force in establishing that neither Eager nor the company did anything or said anything from which the petitioners could infer the existence of the agency. Indeed, the very argument upon which the effect of the judgments as an estoppel against the present contention of the petitioners that Eager was the agent of the company, is sought to be explained away has for its premise that the petitioners had no reason to suppose that Eager was anything but the principal contractor, and were led to believe, both by him and the company, that no such agency existed.

It follows, necessarily, that Eager was not the agent of the company in contracting with the petitioners for the construction of the road, unless the company had in fact conferred authority upon him to act as its agent in the matter. An agency is created—authority is actually conferred—very much as a contract is made, i. e. by an agreement between the principal and agent that such a relation shall exist. The minds of the parties must meet in establishing the agency. The principal must intend that the agent shall act for him, and the agent must intend to accept the authority and act on it, and the intention of the parties must find expression either in words or conduct between them. Now, did the relation in fact exist? There certainly was a contract between Eager as an individual and the Knoxville Southern Railroad as a corporation, entered into before May, 1890, and probably much earlier,—certainly before any of the construction, lien claims for which are here involved, was contracted for,—in which Eager agreed to construct the road at a price of $20,000 in bonds and $20,000 in stock per mile, and other considerations. It is said

that this contract was a sham and a fraud, dated back nearly three years, to save the bondholders of the Marietta & North Georgia Railroad Company, and to cheat the petitioners out of their claims. The fact that the contract was signed by Arthur as vice president shows that it must have been executed some months after its date, because the date is August 20, 1887, and Arthur was not elected vice president until 1888. Moreover, it was during 1888, that the president reported to the stockholders that the work was progressing under the North Georgia Construction Company as contractor, instead of Eager. But the contract was spread on the minutes of the company in May, 1890, so that it must have been executed before that time. The evidence of one or two witnesses points to its existence before March or April of that year. All of the work and labor sued for below was contracted for by Eager after March, and substantially after May, 1890. Even if the reduction of the contract to writing was delayed until 1890, this by no means shows that there had not been before that time a verbal contract, the terms of which had been fully understood between the parties. All the circumstances point to the existence of such a contract. Eager was principal stockholder and president of the North Georgia Construction Company, which was referred to on the company's minutes as contractor in 1888; and Eager says that this company transferred its contract liabilities and rights to him. This is entirely consistent with the probabilities, and there is nothing in conflict with it. Now, whether the contract of the company was originally made with the Georgia Construction Company or Eager is immaterial in this discussion, if neither was the agent of the company, but was an independent contractor. The delay in the execution of the formal contract with Eager was doubtless due to the fact that, in the minds of the individuals whose duty it was to attend to it, the Marietta & North Georgia Railroad Company and the Knoxville Southern Railroad Company were the same enterprise, and Eager's contract with the former was supposed to cover his work on the latter road, just as the bonds and mortgage of the former were evidently supposed to be, in effect, the bonds and mortgage of the latter. There is not, however, anywhere in the proof, a single circumstance or statement that either the company or its directors intended, or that Eager intended, his relation to the company in constructing the road to be anything other than what he always said it was, and what the petitioners understood it to be,—that of principal contractor. The proof is undisputed that Eager received the bonds at the rate of $20,000 per mile of completed road from the trust company as contractor, and that he sold them as contractor, and this during the years from 1887 to 1890. He never accounted to either railroad company for the proceeds of the bonds. Neither company ever demanded such an account from him. He took them as his property,—as his compensation under a contract for work done. Such conduct is not to

be reconciled with his being an agent either in the work or in the negotiation of bonds.

We are clearly of the opinion, therefore, that the contract of August, 1887, whenever executed, correctly represents Eager's actual relation to the company in constructing its road. The contract was one out of which Eager hoped to make profit for himself. It is said that it is one of those contracts frequently condemned by the supreme court. This is true; but the vice of such contracts is not that they do not represent the real relation between the parties, but that they are contracts made by a corporation with one who exercises such an undue influence over the directors, by reason of his relation to them as principal stockholder or otherwise, that it is inequitable and unconscionable for him by such influence to secure individual profit to himself at the expense of the corporation and its other stockholders and bondholders. On this ground, the other stockholders or the bondholders or the corporation itself may call upon a court of equity to set aside the contract against the other party, but no third person can deny its legal existence so long as those who are parties to it do not object to it. It is manifestly absurd to say that the petitioners who supposed they were dealing with Eager as an individual were injured by a contract made by him with the company for his personal benefit and profit, on the ground that he unduly used his influence with the directors of the company to secure this advantage to himself. As they were not injured by it, they cannot complain of it.

The reasoning by which the master, and presumably the court below, reached the conclusion that Eager was the agent of the company, may be seen from the following passage in his report:

"Above it was said that the Knoxville Southern Railroad Company had only a formal existence because of Eager's ownership and control and direction of all its affairs and its officers and agents. This is true; but still in trying to discover and enforce the rights of the parties who may have dealt with said company and with Eager it is impossible to ignore the legal existence of said company. Eager's omnipotence was exercised through formal legal methods, and his power was derived from and based upon the large stock he held in the company, which he received as part pay for the building of the road. But this interest of Eager in the road, and his control of the company and all its officers and agents, made him its general agent,—its plenipotentiary; and whatsoever he did in the building of the road, whatever contracts he made, or were made by agents of his, for material or work for and upon said road, must be regarded as acts and contracts of the company itself, and binding upon it. He could not, by hiding his true relation to the company, shield the company from liability to those he dealt with, as soon as the facts were known that liability might be asserted."

We are wholly unable to concur with the foregoing. Whether Eager hid his true relation to the company depends on whether he was its contractor or its agent. He said he was its contractor, and nothing stated by the master shows otherwise. The corporation was a legal entity different from Eager, having its existence under the statutes of Tennessee, and governed by its directors

in accordance with the law of its creation. Its directors made a contract with Eager. They intended that to be a binding contract on the company. Eager intended it to be. The company, through its legal and authorized governors and agents, therefore, made a contract with Eager. There is no law which makes it impossible for a majority stockholder to enter into a contract with his company. Wright v. Railway Co., 117 U. S. 72, 95, 6 Sup. Ct. Rep. 697. As already explained, the company may appeal to a court of equity to set such contract aside, if it is unfair or unconscionable, for fraud or undue influence; but until this is done the contract expresses the true relation between the parties. The fact that a man has controlling influence with another does not make him that other's agent unless the other intends such relation to exist, or so acts as to lead third persons to believe that it exists. What is true between individuals is true between an individual and a corporation. In the case at bar the master fully admits that there was no holding out of agency in Eager by the company. His finding that an agency in fact existed rests simply on the influence which Eager had over the company, and not in any intention of either that Eager should act as its agent in the construction of the road; and his conclusion is reached in the face of the fact, which he fully admits, that they both intended Eager to be an independent contractor. The master's conclusion cannot be supported.

What has been said does not apply to McBee & Co. or to the co-complainants in their bill, or to the intervening petitioners, if any, who did not reduce their claims to judgment against Eager, for McBee and the others contend that they made their contracts directly with the Knoxville Southern Railroad Company, and refused to deal with Eager. The master made no express finding on this question. The evidence is conflicting. It was not necessary for the master, in the view he took of the case, to consider it. As the case must go back for other reasons, we shall not discuss this question of fact before it has passed under the consideration of the master, to whom it should be referred for report. Nor do our remarks apply to the four petitioners below who recovered judgments against the company for rights of way conveyed directly to the company. We think they are entitled to a lien for the purchase price, and that the decree in their favor should be affirmed.

2. The second question is whether there is anything due Eager, as principal contractor, from the company for constructing the road. If there is any balance due, then, under the act of 1883, already referred to, to the extent of that balance, the intervening petitioners have a lien on the corpus of the railroad and the proceeds of its sale. It is said on behalf of the petitioners that the indebtedness of the company to Eager is conclusively established as against the Central Trust Company by the judgment which Eager recovered against the Knoxville Southern Railway Company in the state court for about $383,764. The master reported that this judg-

ment had been fraudulently and collusively obtained, as averred in the answer and cross bill of the Central Trust Company, and that nothing was due Eager. An examination of the evidence, especially of the minutes of the Knoxville Southern Company, leaves no doubt that the judgment was the result of a conspiracy between Eager, the representatives of certain of the intervening petitioners, and the pliant officers of the Knoxville Southern Railroad Company, to place upon the minutes of that company an acknowledgment of an indebtedness to Eager of a sum sufficient to pay all the intervening petitioners out of the corpus of the road, and a surplus to Eager, although no such indebtedness in fact existed. However meritorious the claims of the petitioners against Eager as principal contractor, it was a manifest fraud for Eager, Bradley, Hood, and others using Eager's controlling voice among the stockholders, to make an admission for the company of its indebtedness to Eager that was false to the knowledge of every one taking part in it. One thing done in the scheme is enough to characterize the whole transaction. By the contract Eager was entitled to $20,000 of stock a mile for 90 miles. The capital stock of the company was only $1,500,000. This left $300,000 of stock which the company could not deliver except by increasing the stock to $1,800,000. Its charter gave the company full power to do so. Eager refused to permit this to be done, and refused to accept $300,000 of stock of the consolidated company about to be formed. The committee reported, in the face of the plain words of the charter, that the company had no power to increase its stock. It was then solemnly decided to refer the question of the amount due to Eager, in lieu of this stock, to three arbitrators, who were all of them interested and active in securing payment of the subcontractors' claims against Eager. They reported that they had concluded to fix the amount due, in lieu of $300,000 of stock, at $275,000. It is undisputed that at that time the stock was worthless, and that the road was insolvent. Eager had 11,505 shares of a total of 15,000 at that time. What pecuniary advantage could it have been to him to have received 3,000 shares more in an insolvent corporation of which he already had nearly three-fourths of the capital stock? The arbitrators' report Eager and other stockholders accepted as proper, and directed the company's officers to settle with Eager on this adjudication, and the previous report of the stockholders' committee that he was entitled to about $100,000 for extras. The officers of the company followed the directions of this vote of the stockholders, employed counsel, who appeared in all the suits brought by Eager and his subcontractors, and admitted the indebtedness of Eager to be as voted by Eager and his fellow stockholders at the meetings above referred to. No court of equity would allow judgments thus obtained to have any evidential effect against one whose interest in the property of the railroad company vested before the action of the stockholders' meeting so that his rights were prejudicially affected thereby. Freem. Judgm. (4th Ed.) § 250.

We are thus brought to the question whether the Central Trust Company had any interest in the property of the Knoxville Southern which entitled it to object to and dispute the amount and validity of the judgments of Eager and the other petitioners establishing liens against the road. The mortgage of January, 1887, did not secure to the mortgagee therein any title to the railroad in Tennessee, because the Marietta & North Georgia Railroad Company, a corporation of Georgia, is not shown to have had any power under the laws of Tennessee or of Georgia to mortgage after-acquired railroad property in Tennessee. The mortgage bonds under that mortgage, however, were given to the contractor of the Knoxville Southern Railroad Company by the Marietta & North Georgia Railroad as his compensation for building the road, which both companies intended should ultimately become a part of the railroad of the Marietta & North Georgia Company. The Knoxville Southern Railroad Company agreed with its contractor, who negotiated the bonds for the purpose stated, that it would give a mortgage on its road to secure those bonds. The Knoxville Southern Railroad Company had power under its charter to issue bonds and mortgage its railroad to secure them. It would be yielding to a mere technicality to say that it could not, under such a power, mortgage its road to secure the bonds issued to build its road, simply because the bonds were issued in the name of some other company. The debt was really the debt of the Knoxville Southern Railroad Company, and the bonds represented the debt. When the Knoxville Southern Company agreed with Eager to give a mortgage to the Central Trust Company to secure the bonds used by him in building its road to the extent of $20,000 a mile, it did what it had the right and power to do, and what it was its duty to do. This agreement created an equitable mortgage upon the Knoxville Southern Railroad Company as old as the contract between Eager and it, of which it was a part. The contract goes back by its date to August, 1887, and by the evidence at least to March or April, 1890. It is said that the mortgage executed in July, 1890, in accordance with the agreement with Eager, was defective, for the reason that the meeting of stockholders at which it was authorized was not called by advertisements in a newspaper at Knoxville, Nashville, and Memphis, as required by statute. The mortgage was approved by all but two shares out of a total of nearly 12,000 shares of stock. We shall not stop to consider this objection. It is enough to say that the resolution of May 20, 1890, and the mortgage, whether defectively executed or not, gave the Central Trust Company, representing the bondholders, an equitable lien on and interest in the railroad of the Knoxville Southern. Some point is made that the road as described in the 1887 mortgage is not the same as the one which was built, but we do not regard this as material. The language of the granting clause of the mortgage is ample to include any extension of the Marietta & North Georgia Railroad Company, as the Knoxville Southern in fact was. Nor do we think there is any difficulty in the description in the mortgage

v.57 F.no.7—49

of July, 1890. It identified the road intended to be mortgaged beyond dispute, and nothing else is needed in a description. It granted all the property of the company "in and to any railway now completed, or hereafter completed, from any point in or near Knoxville, Tennessee, or elsewhere, to a connection with the Marietta and North Georgia Railway Company, together with such other main and branch lines or extensions of said railway as the company may be authorized to construct, or which it shall construct." This description can only apply to the Knoxville Southern Railroad as built, and it sufficiently describes that. If the Central Trust Company acquired an equitable lien and interest in the property of the Knoxville Southern Railroad Company as early as March or April of 1890, then it certainly will be protected in a court of equity against fraudulent and collusive judgments establishing prior liens upon the property rendered long subsequent to the time when it acquired its interest. It was held in the case of Hassall v. Wilcox, 130 U. S. 493, 9 Sup. Ct. Rep. 590, that a judgment in a state court against a railway company, recovered in accordance with a statute securing a contractor's lien thereon, was not even prima facie evidence in a foreclosure suit against the mortgagee, because the statute under which the lien was recovered made no provision for such a general notice as to give it validity as a proceeding in rem. It was there held that it was essential to a proceeding in rem that there should at least be constructive notice by some form of publication or advertisement to adverse claimants to appear and maintain their rights. As in the Texas statute, so in the Tennessee statute applicable to this case, no notice, either personal or constructive, to other than the parties, was provided for. If the judgments, therefore, against the Knoxville Southern Railroad Company are to be taken simply as judgments in personam, it would seem to follow that the Central Trust Company was not bound by the findings and conclusions thereof, unless it was privy to the Knoxville Southern Railroad Company at the time the judgments were rendered. Freem. Judgm. § 154.

It is said, however, that as the interest of the Central Trust Company was only an equitable one, and the Knoxville Southern Railroad Company represented the legal title, the trust company is bound by the judgments as privy to the railroad company. Whether this distinction can be supported we need not determine. We do not rest our conclusion as to the effect of these state court judgments upon the principle laid down in Hassall v. Wilcox, but rather on the actual fraud and conspiracy of the officers and stockholders of the railroad, instigated and connived at by Eager and the representatives of the intervening petitioners in allowing such judgments to go against the company in order to defeat the equitable claim of the Central Trust Company, and to obtain an unlawful priority over it.

It is objected to the mortgage of July, 1890, that it was a preference of one creditor by an insolvent corporation, and therefore void under the law of Tennessee. If the intervening petitioners below

have any claim at all against the Knoxville Southern Railroad Company, their claim is a lien prior in right to that of the Central Trust Company, and therefore they are not injured by the mortgage. If they have no claim against the Knoxville Southern Railroad Company, then they certainly cannot object to any disposition which that company may make of its property. There are no general creditors in this case entitled to make this objection to the mortgage. The only general creditor of the Knoxville Southern Railway in the whole case is the Mechanics' National Bank for $3,000 on a draft discounted after the mortgage was given. It cannot object to previous conveyances by its debtor to secure a valid debt.

With reference to the question whether there was any indebtedness of the company to Eager or not, we have examined the record with care. The committee of stockholders reported that there was $100,000 or more due for extras, in addition to the $275,000 already alluded to. As this was the committee which took part in the fraudulent settlement already alluded to, the evidential weight of their report is not considerable. The amount due, if any, depends upon the exact terms and requirements of the contract between Eager and the company. That refers to certain specifications, which are not set forth in the record. The view which the master took below of the relation existing between Eager and the company enabled him to reach the conclusion that the intervening petitioners were entitled to liens against the company without regard to the indebtedness of the company to Eager. We do not think that the question of the company's actual indebtedness to Eager was as fully presented on the evidence, or as fully considered by the master, as the importance of the issue, under our view of the relations of the parties, requires. For that reason we do not pass upon it, but remand the case to the court below, with instructions to refer the question of the indebtedness of the company to Eager to the master for further consideration and report, with leave to all parties in interest to adduce such further evidence as they may desire.

We have thus far considered this case in the light of the provisions of the act of 1883. Under that act we conclude that the intervening petitioners can only claim as subcontractors, and have no lien against the railway company, unless they can establish an existing indebtedness on the principal contract from the company to Eager, and then only to the extent of that indebtedness. There are two other acts of the legislature of Tennessee to which reference has been made by counsel for the appellees, and upon which reliance was had by the master and the court below. They deserve notice here. The first act was approved February 24, 1873, (Acts 1873, p. 8, c. 8,) and gave authority to certain railway companies of the state to issue consolidated or income bonds, and to mortgage their property to secure the same for the purpose of paying off their indebtedness. Section 5 of the act provided that the provisions of the act should in no way impair any lien or mortgage or priorities

of lien that the state of Tennessee, or any individual, or any corporation, had upon any of said railroad companies, or upon the property of such companies, and contained a proviso also that no such mortgage should bar any judgment against any "such" railroads for work or labor done, or damages done to person or property. The other act was passed in 1877, (chapter 72, p. 92,) to amend the law in relation to the consolidation of railways, and contained this proviso at the end of section three:

"Provided further, that no railway company shall have power under this act, or any of the laws of this state, to give or execute any mortgage, or other kind of lien, on its railway property in this state, which shall be valid and binding against judgments and decrees, and executions issued therefrom, for timbers furnished and work and labor done on, or for damages done to persons or property in the operation of its railroad in this state."

The effect of this proviso was considered by the supreme court of Tennessee in a learned and convincing opinion by Judge Lurton in Frazier v. Railway Co., 88 Tenn. 138, 12 S. W. Rep. 537. It was there decided that the proviso applied to all railroads of the state, and had not been repealed by a general act in 1881, authorizing railroad companies to issue mortgages; that the legislature had the right to impose the limitation as a condition precedent to the exercise by the companies charged with public functions of the power to mortgage all their property. The case there considered was a suit to fasten as a lien upon the property of the East Tennessee, Virginia & Georgia Railroad Company a judgment for damages sustained by the plaintiff from the operation of the same road when it was owned by a railway company against whom a mortgage had since been foreclosed, and from whom title had passed to the defendant. It was held that the lien was valid and binding, under the act of 1877, upon the road in the hands of the purchaser.

We do not think that these acts, or the principles announced in Frazier v. Railway Co., have application to the case at bar. The judgments, decrees, and executions for timbers furnished and work and labor done on, or for damages done to person or property in the operation of, its railroad, referred to in the act, are judgments, decrees, and executions against the railway company; and therefore the timber furnished and the work and labor done must be so furnished and done that under the laws of Tennessee the company would be liable to pay for them to the contractor or material man. If, as we have found, under the act of 1883, the subcontractor or material man had no claim against the company except after notice, and then only for the balance due the principal contractor, a judgment or decree could not be properly rendered against the company in favor of a subcontractor if no balance was due the principal contractor. If, however, such a judgment is obtained by a fraudulent statement of that balance, the statute of 1877 was clearly not intended to prevent a court of equity from disregarding it, and examining the evidence, and determining therefrom whether any balance in fact existed. It is obvious, therefore, that under the circumstances of this case the acts of 1873 and 1877 add nothing to the force of the act of 1883.

We have considered the validity of the mortgages under which the Central Trust Company claims, and the right which the Central Trust Company derives therefrom, only for the purpose of determining that it has a sufficient interest in the property to give it a standing in this cause to object to the validity and enforcement of the claims of the intervening petitioners against the property of the Knoxville Southern Railroad Company. The right of the company, as the mortgagee under the Knoxville Southern mortgage, to have the property sold, cannot be contested by the intervening petitioners, unless they have themselves an interest in the property; that is, unless they have a lien under the act of 1883. If they have a lien under the act of 1883, it is indisputably prior to the rights of the mortgagee, the Central Trust Company; and after the sale of the road, which they pray, and which is also prayed by the Central Trust Company, their liens, if any exist, should be satisfied before the Central Trust Company receives any of the proceeds. If they have no lien upon the road, then it is immaterial to them what the exact right of the Central Trust Company is, and they cannot object to the equitable relief which has been accorded to the Central Trust Company by the decrees pro confesso against the Knoxville Southern Railroad Company and the Marietta & North Georgia Railroad Company, namely, of the foreclosure of the mortgage, sale of the road, and distribution of the proceeds. It follows, therefore, that after the payments of the liens which are found to be valid against the railway company in favor of the intervening petitioners, the proceeds must go to the Central Trust Company upon its mortgage.

These views render it unnecessary for us to consider the consolidation of the Knoxville Southern Railroad Company and the Marietta & North Georgia Railroad Company, its validity or its effect.

The decree is reversed, with instructions to the court below to take such further proceedings as shall be in accordance with this opinion.

### Cross Appeals.

A number of lien claimants filed cross appeals. One of them, the Mechanics' National Bank of Knoxville, sought to have a lien declared in its favor for three drafts. The first, for $2,000, was drawn by George R. Eager in favor of the North Georgia Construction Company upon H. A. Eager, treasurer, Herald Building, Boston, Mass., and was indorsed by the construction company, by George R. Eager, president. No liability appears on this draft against the Knoxville Southern Railroad Company, and no reason is shown why recovery should be had against that company thereon. The third draft, for $2,535, was drawn by George R. Eager to the order of the North Georgia Construction Company upon H. A. Eager, treasurer, Herald Building, Boston, Mass., and indorsed by the North Georgia Construction Company, by George R. Eager, president. There is nothing upon the face of this draft, and noth-

ing in the evidence, to indicate that this is an obligation of the Knoxville Southern Railroad Company. The two foregoing drafts are within the class of debts already referred to in the opinion, made with Eager as contractor and an individual, but held by the master to be debts of the company, on the ground that he was acting as agent for the company. The second draft, for $3,000, was drawn by the Knoxville Southern Railroad Company, by Melvin R. Gay, treasurer, in favor of itself, on the North Georgia Construction Company, Herald Building, Boston, Mass. It was accepted by the improvement company, by H. A. Eager, treasurer, and indorsed by the Knoxville Southern Railroad Company, by Melvin R. Gay, treasurer, and George R. Eager, president. This draft was duly protested, and entitled the holder to a judgment against the Knoxville Southern Railroad Company as an indorser. The fact that the money on the draft was deposited to the credit of Eager, and was used by him to pay for labor and material in the construction of the road, cannot by any theory of law give to the holder of the draft a lien under the act of 1883. It makes the holder simply a general creditor of the company, and entitled to share in the proceeds after those who have liens upon the property shall have been paid, if any surplus remains. The appeal of the Mechanics' National Bank is therefore dismissed.

The appeal of the State National Bank is also dismissed, for the reasons that the drafts upon which it sought to have a lien adjudged to it against the Knoxville Southern Railroad Company show that they were drafts drawn by George R. Eager and accepted by H. A. Eager, and did not have upon them any indorsements or acceptance of the Knoxville Southern Railroad Company. They are not, therefore, claims against the railroad company, and the appeal of their holder, the State National Bank, is dismissed.

We have considered all the other assignments of error that have been brought to our attention. There are some general assignments of error based on exceptions which appear in the record, but which are not referred to in the briefs of counsel, and which, in such a voluminous record, it is not possible for us to consider without having our attention called to them specifically, in accordance with the rule requiring that assignments of error shall fully point out the action of the court objected to. For these reasons the cross appeals are all dismissed.