## THE GULFPORT.

(Circuit Court of Appeals, Fifth Circuit. April 2, 1918.)

1. ADMIRALTY ☞12—JURISDICTION—"MARITIME CONTRACT"—"SALVAGE SERVICE."

While a tug was in a sectional dry dock in the Mobile river, owned by libelant, for repairs, certain sections of the dock in which the tug lay were driven by a violent storm across the river and upon land above the ordinary high-water mark. Libelant contracted with the owner to replace the tug in the river, the question of liability therefor to be later determined. *Held*, that the contract was a "maritime" one, and the service one of "salvage," so that suit to recover therefor was within the admiralty jurisdiction.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Maritime Contract; Salvage Service.]

2. WHARVES ☞13—BAILEE—RIGHTS OF.

Where sections of libelant's dry dock on which a tug was resting were blown from their moorings onto the shore above high-water mark, libelant being a bailee whose possession was lost through act of God, the bailor, the owner of the tug, is responsible for expenses necessarily incurred by libelant in retaking possession of the vessel.

Appeal from the District Court of the United States for the Southern District of Alabama; Robert T. Ervin, Judge.

Libel by the Ollinger & Bruce Dry Dock Company against the tug Gulfport, claimed by the Gulfport Towing Company. From a decree for the libelant (243 Fed. 676), claimant appeals. Affirmed.

Palmer Pillans, of Mobile, Ala. (James A. Leathers, of Gulfport, Miss., on the brief), for appellant.

D. P. Bestor, Jr., Harry T. Smith, and William G. Caffey, all of Mobile, Ala., for appellee.

Before WALKER and BATTS, Circuit Judges, and GRUBB, District Judge.

WALKER, Circuit Judge. This is an appeal by the claimant of the tug Gulfport from a decree against that vessel rendered on a libel in admiralty which disclosed the following state of facts: The libelant owned and operated dry docks located on the east bank of the Mobile river, one of which was made up of seven sections, which could be operated jointly as one dock or separately and in different combinations according to the size of the vessel to be docked. On or about June 28, 1916, the libelant, at the request of the owner of the tug Gulfport, for a stated price raised it on three sections of this dry dock, and agreed for the tug to remain there for a stipulated price per day

while it was undergoing repairs which were to be made by the libelant and a ship repair company of Mobile; the master and crew of the tug to remain on it while it was docked, and the repairs to be done under the direction of the master. On July 5, 1916, while the tug was so docked for the purpose stated, a hurricane of great violence caused the three sections of dock which had the tug on them to break away from their moorings, and the wind and the waves carried them from where they had been on the east side of the Mobile river up the river for about a mile and left them aground, with the tug still on them, in the marsh on the west side of the river, where they were when the storm ended. The land on which the three sections of the dock, with the tug resting thereon, were left stranded, belonged to a railway company, which would not permit their removal until the libelant had agreed to be responsible for all damage done to the dock and tug in the floating and removal thereof and to restore the property to its previous condition. The work of floating and removing the stranded sections of the dry dock, with the tug still thereon, was done by a contractor employed by the libelant after the latter had entered into a written contract with the owner of the tug, which, after reciting the latter's denial of liability for any part of the expense of getting afloat the stranded sections of dock with the tug thereon, stipulated that such owner was not to interfere in any way with the doing of that work, that it suffered and permitted the libelant, through a named contractor, who had agreed to remove the three sections with the tug on them for $11,300, and to handle and conduct the matter as though the tug, as well as the three sections of dock, were its property, and that, if thereafter it should be determined that the owner of the tug was liable to pay part of the expense and cost, then the amount of its liability should be taken as $7,700; the contract stating:

"It being the purpose and intent of this agreement that the only matter open for litigation between the parties hereafter is the fact of liability vel non, it being agreed that if the towing company (the owner of the tug) should be held liable, then the measure of such liability is fixed hereby, and no evidence need be adduced to fix the measure otherwise."

Thereafter the libelant, through the contractor mentioned, floated from the place where they were stranded the three sections of dock, with the tug thereon, by means of a cofferdam constructed around them, and after they were so floated the libelant returned the three sections of dock to their former site on the east side of the river, and the necessary repairs originally intended to be made on the tug were thereafter made by its owner while it rested on the three sections of dock. The libel as it was amended contained the following averment:

"That during the period from July 5, 1917, up to and including the date on which said tug Gulfport was finally floated as hereinafter averred, equinoctial or West Indian hurricanes were liable to occur in this vicinity, as such period was the storm period of the year in which storms of the character which stranded said dock and tug were likely to occur hereabouts, and libelant avers that during said time said tug Gulfport was in a position of danger and further injury, and libelant further avers that the day after said dock and tug were so floated, on or about the first part of October, one of such equinoctial or West Indian hurricanes or storms did in fact occur in Mobile, which

would have seriously damaged said dock and tug had they not have been previously removed and rendered secure and safe at the plant of libelant."

After the overruling of exceptions to the libel as amended, an answer to it was filed which admitted all its averments except the above-quoted one as to the tug being endangered. The testimony of the president of the libelant was the only evidence adduced. His testimony tended to prove the following: That the period between July 5th and the date of the floating of the three sections of dock with the tug on them was the one known in that locality as the period for West Indian hurricanes and equinoctial storms; that a storm of very great violence and intensity occurred a few days after such floating was effected; that sections of the dry dock other than the three on which the tug rested were moved by the July storm up the river and into the marsh on the east side about the same distance from the bank of the river as the three which carried the tug, but the latter sunk deeper in the mud, and it was more difficult and expensive to get them floated with the tug on them; and that neither of the three sections of dock supporting the tug nor the tug was damaged by the storm which occurred a few days after they were floated.

[1] The claimant moved the dismissal of the amended libel on the ground:

"That the sections of dry dock with the tug on them were carried, by the great hurricane which threw them up there, high and dry ashore, above and beyond ordinary high-water mark, so that the service rendered by libelant * * * was a land service, and not a maritime service."

It may be assumed that the ground stated was well founded in fact, though no more was shown as to the location of the three sections of dry dock with the tug on them than that they were in the part of the marsh on the west side of the Mobile river which belonged to a named railway company; it not being disclosed by either the libel or the evidence that they were entirely above and beyond ordinary high-water mark. We are not of opinion that the fact, if it was a fact, that the storm left them aground above ordinary high-water mark, deprived the service rendered of its maritime character. The counsel for the appellant refers us to a text-book definition of a salvage service which states as an element of such a service the location, either in navigable waters or on the shore thereof, of the maritime property saved or helped to be saved, and contends that such property when above ordinary high-water mark is not on the shore, which is the ground between ordinary high-water mark and low-water mark. It is very much to be doubted whether the framer of the definition intended to use the word "shore" in the technical sense which it has acquired in the law, especially in the matter of determining the location of the boundary between land under navigable water and adjacent land owned by another proprietor, rather than to describe the coast or land adjacent to the sea or other navigable water, not limited to that below ordinary high-water mark. However that may be, we are not advised of any authoritative judicial ruling which indicates that the circumstance that the stranding or grounding of a vessel leaves it above ordi-

nary high-water mark has the effect of preventing its being the subject of a salvage or other maritime service. A service rendered in restoring a vessel so placed to the element in which alone it is of use, from which it was forced by the violence of a storm, is of a nature to facilitate or render possible the continuance of its use as an instrument of navigation. The service is as closely related to navigation as the furnishing of necessary supplies to a vessel or the making of necessary repairs upon one. Such services are maritime ones. The steamship Jefferson, 215 U. S. 130, 142, 143, 30 Sup. Ct. 54, 54 L. Ed. 125, 17 Ann. Cas. 907.

The rescue of stranded or grounded vessels is a common form of salvage service. So far as we are advised, the contention that a vessel ceases to be the subject of such a service as a result of the circumstance that a storm of which it was the victim was of such violence .as to force and leave it aground above ordinary high-water mark is made in the instant case for the first time. There has not been suggested any reason which seems to us at all convincing to support the conclusion that it would be in contravention of, or out of harmony with, the public policy evidenced by the law of salvage to permit the allowance of compensation and reward for the voluntary saving of marine property cast by the violence of the sea just above ordinary high-water mark. To withhold such recompense from one voluntarily effecting such a rescue, it seems, would amount to giving effect to an arbitrary distinction in the absence of any substantial difference between the service rendered and another like it which unquestionably would be classified as a salvage one. It is not necessary to determine whether the service in question would have had all the elements of a salvage one if it had been rendered voluntarily and not under a contract. That it was a maritime one is enough to entitle the libelant to invoke the jurisdiction of a court of admiralty to enforce the liability claimed to have been incurred by the rendition of the service in the circumstances stated.

[2] It was as a bailee that the owner of the dry dock was in possession of the tug. The storm had the effect of depriving the bailee of the possession of both the tug, the subject of the bailment, and the three sections of dry dock upon which it rested. This loss of possession was attributable to an act of God, and not to any fault or negligence of the bailee. The bailee not being under a duty to regain possession of bailed property so taken from it, the bailor is chargeable with the expense necessarily incurred to accomplish this result. Williamson v. Phillipoff, 66 Fla. 549, 64 South. 269, 52 L. R. A. (N. S.) 412; Fairmont Coal Co. v. Jones & Adams Co., 134 Fed. 711, 67 C. C. A. 265.

The conclusion is that the tug was chargeable for the reasonably necessary expense of floating it, and that the court properly adjudged against it the agreed amount of that expense.

The decree is affirmed.