## BUTLER v. ELLIS et al. (two cases).

### *In re* WALDECK–DEAL DREDGING CO.
#### (two cases).
#### Nos. 3108, 3109.

Circuit Court of Appeals, Fourth Circuit.
Dec. 19, 1930.

H. H. Taylor, of Miami, Fla. (Oscar Leach, of Raleigh, N. C., on the brief), for appellant.

E. K. Bryan and Isaac C. Wright, both of Wilmington, N. C. (Harry Z. Holmes, K. O. Burgwin, Carr, Poisson & James, Emmett H. Bellamy, Herbert McClammy, and Bryan & Campbell, all of Wilmington, N. C., on the brief), for appellees.

Before PARKER, Circuit Judge, and WILLIAM C. COLEMAN and GLENN, District Judges.

PARKER, Circuit Judge.

The Waldeck-Deal Dredging Company is a Florida corporation with its principal place of business at Miami in that state. It had a contract with the United States to dredge a section of the Intra-Coastal Waterway, which is being constructed along the eastern shores of the United States, the sec-

tion covered by the contract extending from the channel of the Cape Fear river below Wilmington, N. C., northeastwardly to the sound. In carrying on the work under the contract, it used a suction steam dredge and began operations in the channel of the Cape Fear, pumping soil and water through pipes on to the land. The dredge was at all times afloat, either in the river or in the canal of the waterway as it was dredged away from the river. There were used, in connection with the dredge, a tug, a lighter, a barge,. and some pontoons; and these, with the dredge, constituted the property of the dredging company within the Eastern District of North Carolina.

On October 22, 1929, an involuntary petition in bankruptcy was filed against the dredging company in the Southern District of Florida, and Raymond W. Butler was appointed temporary receiver of its property. On October 24th, he joined with the petitioning creditors in asking the District Court for the Eastern District of North Carolina to appoint ancillary receivers to take charge of the property of the bankrupt corporation in that district, and he and one R. D. Cronly were appointed ancillary receivers for that purpose, and took charge of the property. The dredging company was adjudged bankrupt by the Florida court on December 9, 1929, and on December 30th, at the first meeting of creditors, Butler was appointed trustee in bankruptcy.

After the property of the bankrupt in the Eastern District of North Carolina had been taken in possession .by the ancillary receivers, certain seamen, having claims for wages for services rendered on the dredge, and other persons, who had furnished supplies to the dredge to be used in its operation upon the orders of the general manager of the owner, filed their intervening petitions in the ancillary proceedings, asserting liens upon the dredge and other property used in connection therewith for wages due and supplies furnished, and asking that their liens be declared and enforced against the property in the possession· of the ancillary receivers. The trustee moved to dismiss these petitions upon the ground that the District Court for the Southern District of Florida had exclusive jurisdiction to pass upon and allow or disallow the liens claimed; and, upon this motion being denied, filed answer averring among other things that petitioners were not entitled to a maritime lien upon the dredge, as it was not a vessel within the meaning of the maritime law and was not upon naviga-

ble' waters and was not used nor intended to be used in navigation. The District Judge entered decrees establishing the claims of petitioners as liens against the dredge, condemning same to be sold for their satisfaction, and appointing Cronly commissioner to make the sale. The trustee excepted to these decrees, but did not appeal therefrom, and the sale was duly made at public auction on August 11, 1930, and reported to the court. No notice appears to have been given creditors of this sale. On September 16th the trustee objected to the confirmation of the sale, and filed petitions praying that the court vacate the interlocutory orders declaring the liens and order the property in the hands of the ancillary receivers delivered to him to be administered under the directions of the Florida court. The judge below ordered the pleadings and motions of the trustee stricken out, and entered a final decree confirming the sale, allowing fees to the commissioner, the ancillary receivers, and their attorneys, and directing that the remainder of the funds realized from the sale be distributed among the lien claimants. From this decree, the trustee has appealed.

The assignments of error raise three questions for our consideration: (1) Whether the court below had jurisdiction to adjudicate the liens claimed against the property in its possession and order the sale of same for their satisfaction; (2) whether the claims asserted by petitioners constituted liens against the property; and (3) whether, in any event, the court below could order the sale of property belonging to bankrupt and make allowances to receivers and attorneys for services rendered, without giving notice thereof to creditors and otherwise complying with the provisions and restrictions of the Bankruptcy Act.

■ On the first question, we think there can be no doubt as to the power of the court to determine the liens upon the property which it had seized and taken into possession through its receivers. The ancillary receivers were appointed pursuant to the power granted to the court to "exercise ancillary jurisdiction over persons or property" within its territorial limits "in aid of a receiver" appointed by another court of bankruptcy. Bankruptcy Act § 2(20), as added by Act June 25, 1910, § 2, 36 Stat. 838, 11 USCA § 11(20). The seizure of property as belonging to the bankrupt necessarily implied the power and duty of determining the ownership of the property seized; and the determination of ownership necessarily involved

the ascertainment and adjudication of liens asserted against it. It is unthinkable that, in authorizing the district courts to exercise ancillary jurisdiction in aid of a receiver or trustee in bankruptcy appointed in another jurisdiction, it was intended that these courts should do no more than seize property designated by the officer of the foreign court and, without hearing those who adversely claim the property or an interest therein, turn it over to be administered in a jurisdiction hundreds of miles removed from the residence of the claimants. The first duty of a court is to do justice; and it is manifest that, when through its receiver it lays its hands on property, and thus renders it impossible for any other court to determine the ownership thereof or the rights of property therein, justice requires that it should itself hear and pass upon the claims of those who assert that the property belongs to them and not to the bankrupt, or that they have the right to have it applied in satisfaction of liens, and that the only interest of the bankrupt, or of those who have succeeded to his rights, is held in subordination thereto.

"Where a court of competent jurisdiction has taken property into its possession, through its officers, the property is thereby withdrawn from the jurisdiction of all other courts. The court, having possession of the property, has an ancillary jurisdiction to hear and determine all questions respecting the title, possession, or control of the property. In the courts of the United States this ancillary jurisdiction may be exercised, though it is not authorized by any statute. The jurisdiction in such cases arises out of the possession of the property, and is exclusive of the jurisdiction of all other courts, although otherwise the controversy would be cognizable in them." Murphy v. John Hofman Co., 211 U. S. 562, 569, 29 S. Ct. 154, 156, 53 L. Ed. 327.

And it makes no difference that the court, having possession of the property, may be a court of ancillary jurisdiction. By virtue of its possession of the property, it has the inherent power to determine claims respecting the property which has come under its control. Cyclopedia of Fed. Procedure, vol. 1, p. 623; McBee v. Marietta & N. G. R. Co. (C. C.) 48 F. 243; Id. (C. C. A.) 57 F. 753; Id. (C. C. A.) 67 F. 84.

And the rule is no different, we think, in bankruptcy proceedings, where the court of ancillary jurisdiction is proceeding under the Bankruptcy Statute. The leading case on the subject is Fidelity Trust Co. v. Gaskell

(C. C. A. 8th) 195 F. 865, 871, in which the late Judge Sanborn went into the matter very fully and stated the rule applicable as follows: "A proceeding in bankruptcy is a proceeding in equity, and a district court sitting in bankruptcy, whether it is exercising its primary or its ancillary jurisdiction, is a court of equity. It is an established principle of equity jurisprudence that whenever a court of chancery takes into its legal custody, and thereby withdraws and withholds property from replevin, attachment, or other legal proceedings, it hears and adjudges the claims to the title and to legal and equitable liens upon that property of all parties who intervene in the suit or proceeding before it in their own behalf and submit their claims to its adjudication. * * * Ancillary jurisdiction is a term which has a plain and well-known meaning in the equity jurisprudence of the United States, a meaning fixed by settled practice and adjudged by the uniform current of the decisions of the courts of the United States. As neither the court nor the Congress modified or limited the term, the unavoidable presumption is that they used it, and intended to use it, in its recognized legal significance. In that significance ancillary jurisdiction includes the power to hear and adjudge, at the request of interveners, their claims to title to, or legal or equitable liens upon, the property it takes, or holds in its legal custody, by virtue of that jurisdiction and to send the proceeds to the court of original jurisdiction, or to apply it to the discharge of the claims of the interveners in accord with its decision."

The case of Fidelity Trust Co. v. Gaskell involved an intervention in the court of ancillary jurisdiction of an adverse claimant of the property in the hands of the ancillary receivers. That case was followed, however, by a case in the Circuit Court of Appeals of the Sixth Circuit, Emerson v. Castor, 236 F. 29, 36, which involved the assertion of laborers' liens. In sustaining the power of the court of ancillary jurisdiction to pass upon and allow the liens asserted, the court, speaking through Judge Warrington, said: "Ancillary jurisdiction, it is true, signifies power to aid primary jurisdiction. But the power in an ancillary tribunal to take possession of property at all is founded on the interest therein of the person or estate in whose right the proceeding is maintained; and this interest cannot, in the nature of things, be ascertained without passing upon such adverse interests as may be claimed by others in the property. When, therefore, an ancillary tri-

bunal takes possession, whether with or without opposition, such possession draws to that tribunal power, indeed, imposes a duty, to determine all questions of priorities and liens affecting the property."

Other cases supporting the rule are In re Einstein (D. C.) 245 F. 189; In re Meyer & Judd (D. C.) 1 F.(2d) 513, 526; and In re Rodgers & Garrett Timber Company (D. C.) 22 F.(2d) 571, 574. We agree with the following statement of Judge Coleman in the last of these cases: "The weight of authority supports what seems to be the proper rule, namely, that a court of ancillary jurisdiction has power to determine priorities and liens in regard to property brought within its jurisdiction, and to pass such orders as may be necessary in connection with the satisfaction of same."

The cases relied upon by counsel for the trustee in bankruptcy are not in point. In Lazarus v. Prentice, 234 U. S. 263, 34 S. Ct. 851, 58 L. Ed. 1305, a claim was asserted on funds in the hands of ancillary receivers for attorneys' fees for services rendered bankrupts after the adjudication of bankruptcy. The holding was that no right could be acquired in the funds by assignment subsequent to the filing of the petition in bankruptcy. It did not touch upon the power of a court of ancillary jurisdiction to determine the ownership of property seized by ancillary receivers or adjudicate prior liens asserted thereon. In Knauth, Nachod & Kuhne v. Latham, 242 U. S. 426, 37 S. Ct. 139, 61 L. Ed. 404, there was an attempt to secure priority of payment on a claim arising out of the fraud of bankrupt by filing a cross-bill in a suit instituted by the trustee to recover property preferentially transferred, without tracing the funds fraudulently obtained into the property which was the subject-matter of the suit or showing other interest in that property. Tidewater Plumbing Supply Co. v. Schimmel (C. C. A. 4th) 296 F. 459, held merely, in line with Lazarus v. Prentice, supra, that after a petition in bankruptcy had been filed, property was in custodia legis and valid liens thereon could not be created subsequently. This court in its opinion in that case recognized the rule as established by Fidelity Trust Co. v. Gaskell, supra, and Emerson v. Castor, supra, but held that it was not applicable under the circumstances there disclosed.

The case of In re Patterson Lumber Company (D. C.) 247 F. 578 involved merely the question as to whether a court of ancillary jurisdiction should determine whether a mortgage should be enforced through the court or in independent proceedings by the mortgagee; and Judge Sanford, in writing the opinion, pointed out that this was a very different question from that of the power of the court to determine whether property seized was in fact the property of the bankrupt. It is true that the learned judge used some language which tends to sustain the position of the trustee here; but in the later case of In re Dayton Coal Company (D. C.) 291 F. 390, at page 401 he recognized that the rule had been stated by him "overbroadly," and we do not think that the Patterson Lumber Company Case can be regarded as laying down a rule different from that laid down by the case of Fidelity Trust Co. v. Gaskell, and Emerson v. Castor, supra.

In the case of West v. Empire Life Insurance Co. (D. C.) 242 F. 605, right to intervene in a suit brought by ancillary receivers to wind up an insolvent corporation in which the bankrupt owned stock was denied because the stock was in the possession of the bankruptcy court of primary jurisdiction; and no question was raised as to the right of a court of ancillary jurisdiction to determine the right to and adjudicate liens upon property seized by it. The Casco (D. C.) 230 F. 929, involved the question as to whether a court of bankruptcy of ancillary jurisdiction would surrender property in its possession to a court of admiralty in order that admiralty liens might be declared and enforced by the latter, not whether the court which had taken possession of the property had the power itself to adjudicate and enforce the liens.

It is said that the court of primary jurisdiction is the one to administer the estate of the bankrupt and to direct the sale of the bankrupt's property. This is true; but the sale here was ordered, not as an incident of the administration of the bankrupt's estate, but as incidental to the establishment and enforcement of the liens asserted by the interveners. If the power of the court to declare and enforce liens upon the property seized by it be conceded, it necessarily follows that it has the power to sell the property for the satisfaction of the liens, for this is the only practical manner in which the liens may be enforced. See In re Rodgers & Garrett Timber Co., supra, and In re Meyer & Judd, supra.

We come then to the second question, viz., as to whether the claims asserted by petitioners constituted liens against the property. As heretofore stated, these claims were

for wages due for services rendered to the dredge and for supplies used in its operation and furnished upon orders of the general manager of its owner. Under the maritime law, these constituted liens upon the dredge. It is elementary that the wages of seamen are a primary lien upon a vessel which, as has been said, "adheres to the last plank." Sheppard v. Taylor, 5 Pet. 675, 710, 8 L. Ed. 269. And, with respect to the supplies furnished, it is provided by statute, Act June 5, 1920, c. 250, § 30, subsec. P, 41 Stat. 1005, 46 US CA § 971, as follows: "Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel."

It is contended in behalf of the trustee that the dredge was not a vessel within the meaning of the statute, and that, if it was, it was not occupying the position of a vessel, in that it was not engaged in a maritime employment. Neither of these positions, we think, is well taken. The dredge was not only afloat, but was designed and equipped for navigation. It transported from place to place the machinery used in dredging and was engaged in opening up a channel for navigation. It is well settled that under these circumstances it was a vessel within the meaning of the admiralty law, and, as such, subject to liens for wages and supplies. What was said by Judge Benedict in the case of The Pioneer (D. C.) 30 F. 206, 207, is directly in point. Said he: "The dredge before the court in this case is adapted to be an instrument of transportation on navigable water, and was used in naval transportation when she transported from place to place the steam-shovel and engine, and maintained the same afloat on navigable water, while being used for the purpose of deepening channels. She is within the definition of a vessel given by the Revised Statutes, tit. 1, c. 1, for she is an artificial contrivance, used, or capable of being used, as a means of transportation on water. In my opinion, her legal status is that of a vessel."

In Saylor v. Taylor (C. C. A. 4th) 77 F. 476, 478, this court upheld maritime liens in favor of seamen for wages and of those who had furnished towage and supplies to a dredge engaged in cleaning out and deepening the channels of certain creeks tributary to the Potomac River. The court, speaking through Judge Brawley, said: "At first blush it would seem a stretch of the rule to hold a dredge and her accompanying scows to belong to the same class with ocean steamships. The idea of commerce does not come into the mind primarily in connection with such craft; but, when it is borne in mind that they are constructed to move upon the water, and nowhere else, and that, while thus moving upon the water, they are subject to all the rules that govern other water craft as to lights, collisions, etc., it will be seen that they have that mobility and capacity to navigate which are recognized as the prime elements in determining the subjects of maritime liens. And so it seems a stretch of the imagination to class the deck hands of a mud dredge in the quiet waters of a Potomac creek with the bold and skillful mariners who breast the angry waves of the Atlantic; but such and so far-reaching are the principles which underlie the jurisdiction of the courts of admiralty that they adapt themselves to all the new kinds of property and new sets of operatives and new conditions which are brought into existence in the progress of the world. Hence it is that in all times and in all countries those who are employed upon a vessel in any capacity, however humble, and whose labor contributes in any degree, however slight to the accomplishment of the main object in which the vessel is engaged, are clothed by the law with the legal rights of mariners, 'no matter what may be their sex, character, station, or profession.' Ben. Adm. § 241."

The rule that dredges engaged in work in furtherance of navigation are vessels within the meaning of the maritime law, and as such are subject to maritime liens for wages and supplies furnished, is sustained by the overwhelming weight of authority. The Dredge A (D. C.) 217 F. 617; North American Dredging Co. v. Pacific Mail S. S. Co. (C. C. A. 9th) 185 F. 698; Charles Barnes Co. v. One Dredge Boat (D. C.) 169 F. 895; McMaster v. One Dredge (D. C.) 95 F. 832; McRae v. Bowers Dredging Co. (C. C.) 86 F. 344; The Steam Dredge No. 1 (D. C.) 87 F. 760; The International (D. C.) 83 F. 840; The Starbuck (D. C.) 61 F. 502; The Atlantic (D. C.) 53 F. 607, and see other cases cited in note in 59 A. L. R. page 1343.

The trustee relies upon certain cases involving dredges engaged in nonmaritime undertakings such as J. C. Penney-Gwinn Corp. v. McArdle (C. C. A. 5th) 27 F.(2d) 324, 59 A. L. R. 1342; In re Hydraulic Steam

Dredge No. 1 (C. C. A. 7th) 80 F. 545, and The W. T. Blunt (D. C.) 291 F. 899. Without passing upon the point involved in these cases, we think that they have no application here. The dredge here involved was engaged in an undertaking essentially maritime, viz., the dredging of the channel of the Intra-Coastal Waterway. The fact that it was required to cut a part of the channel of the waterway through the land is, we think, immaterial. It was at all times afloat in navigable waters, even while so engaged.

On the third question, however, we think that the learned judge below was in error in confirming a sale of the property and in allowing fees to the receivers and attorneys without giving notice to creditors or observing the limitations on allowances prescribed by the Bankruptcy Act. Although the sale was ordered as an incident to the enforcement of liens and the allowances were made in connection with services rendered in the court of ancillary jurisdiction, it must not be overlooked that the property sold was, subject to the liens of the interveners, the property of the bankrupt, and that the court was exercising its jurisdiction under the provisions of the Bankruptcy Act. It was bound to observe the provisions of that act, therefore, in making sales of property or in making allowance to its officials.

Section 58a of the Bankruptcy Act provides that creditors shall have at least ten days' notice by mail of "all proposed sales of property." 11 USCA § 94(a). And section 48 provides that they shall have notice in like manner of applications for compensation by receivers, marshals, and trustees, and imposes limitations as to the amount of compensation to be allowed them. 11 USCA § 76. There is nothing in the act which excepts courts of ancillary jurisdiction from complying with these provisions in cases where they order sales of property or make allowances of compensation; and there is every reason for enforcing them in the case of these courts that exists in ordinary cases. The object of notice to creditors in the case of sales is to prevent fraud and the sacrifice of the bankrupt's property at inadequate prices; in the case of compensation it is to guard against unreasonable allowances. These are to be apprehended as well in cases of sales and allowances by courts of ancillary as by those of primary jurisdiction.

The decree appealed from will be set aside, therefore, in so far as it confirms the sale of the property and in so far as it makes allowances of compensation, and the case will be remanded to the end that notice may be given to creditors of the sale and proposed confirmation and of the application of receivers, commissioners, and counsel for allowances. The court need not order a resale of the property unless, after notice to creditors, it shall appear that the amount of the bid is grossly inadequate or unless a substantially advanced bid is offered. In making allowances, the limitations of the statute referred to and the requirement of General Order No. 42 should be observed.

In concluding, it might be well to notice that there was error in that part of the decree which held that the trustee was not a party to the cause. Upon his appointment and qualification, he became vested with the title to the bankrupt's property, wherever situate, as of the date he was adjudged a bankrupt. Bankruptcy Act 70a (11 USCA § 110(a); Knauth, Nachod & Kuhne v. Latham & Co., 242 U. S. 426, 37 S. Ct. 139, 61 L. Ed. 404. He intervened in the cause and filed various answers and petitions, as was proper, for it was his right and duty to appear and protect the interest of the bankrupt estate in the property which the interveners were seeking to subject to liens. His contentions, that the court had no jurisdiction to adjudicate the liens and that the liens were not valid, were not well grounded; but, nevertheless, he is a party to the cause with a right to be heard as to any proceedings taken therein.

Affirmed in part.

Reversed in part.

Remanded, with directions.