**J. RAY McDERMOTT & CO., Inc.,**
Appellant,

v.

**THE OFF-SHORE MENHADEN COMPANY, In Bankruptcy, Ancillary,**
Appellee.

**No. 17200.**

United States Court of Appeals
Fifth Circuit.

Jan. 9, 1959.

Rehearing Denied Feb. 11, 1959.

Charles D. Marshall, R. B. Howell, Jr., New Orleans, La. (Milling, Saal, Saunders, Benson & Woodward, New Orleans, La., of counsel), for appellant.

Roy T. Rhodes, Tallahassee, Fla., Viola J. Hilbert, Gulfport, Miss., for appellee.

Before RIVES, TUTTLE and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

In the bankruptcy proceeding of appellant, The Off-Shore Menhaden Company, J. Ray McDermott & Co., Inc., unsuccessfully sought a maritime lien against two vessels of the Bankrupt for the cost of dredging out a special slip on Rattlesnake Bayou, Louisiana, for use as a permanent berth. We affirm.

What we know, and all that we know, comes from a stipulation of the parties. It may be briefly summarized. In 1955 the Bankrupt commenced its operations in the processing of menhaden fish into scraps, oils, and solubles. It owned only three vessels. Two were the dumb-barges, Fish Factory No. 1 and ABL 123, the other, the fishing utility towing vessel Bebeco. The barges were equipped with machinery and facilities for the complete processing of menhaden.

In the first season of 1955, the factory barges were anchored in the Gulf of Mexico nearby the supporting fishing vessels. This proved unprofitable because of irretrievable loss of equipment overboard, high wages for the labor force held at sea for long periods of time, and continual interruption of operations by heavy seas, gales and Gulf of Mexico weather disturbances requiring removal of the flotilla to and from ports of haven.

In the second season of 1956 the vessels were anchored in Rattlesnake Bayou. This location was reasonably close both to the fishing grounds in the Gulf, as well as the land market for the finished products. But this, too, proved unsuitable because of loss of equipment overboard, the continued, though less frequent, withdrawals to safe refuge during weather disturbances, and undoubtedly most important, the continual necessity of shifting anchorage to accommodate the substantial movement of nondescript oil field vessels moving up and down the Bayou. These deficiencies for both 1955 and 1956 were the primary cause of the financial unprofitable operations of the Bankrupt.

To avoid this, Bankrupt in 1957, after securing necessary approval from Federal and State regulatory agencies as well as permission of the owners of the land adjacent to the Bayou, arranged with McDermott to dredge out a berth on Rattlesnake Bayou. The slip was dredged out of the bank to a uniform depth of ten feet. It was cut far enough into the shore to accommodate the beam of the two factory barges, to afford protection from weather disturbances, and, at the same time, provide a mooring on the offshore side of the barges for loading and unloading fishing vessels without interfering with the movement of other craft within the established navigational lines of the Bayou.

The slip was dredged in length sufficient to accommodate the factory barges end to end.

 The dispute here is whether this was the "furnishing [of] repairs, supplies, towage, use of drydock or marine railway, or other necessaries to [a] vessel" as the Maritime Lien Act prescribes. 46 U.S.C.A. § 971. We approach the problem as we have before with no niggardly begrudging interpretation of "other necessaries." For "we think the statutory words 'other necessaries' should not be narrowly interpreted as was done in cases like The J. Doherty (D.C., 207 F. 997), The Hatteras, supra (2 Cir., 255 F. 518), The Muskegon, 2 Cir., 275 F. 348, The Suelco, D.C., 286 F. 286, but that they should be given a broad meaning, as they were in The Rupert City, D.C., 213 F. 263, and The Henry S. Grove, D.C., 285 F. 60, and held to include maritime services generally, at least in so far as port charges are concerned, whether such services consist of the furnishing of labor or material." The Western Wave, 5 Cir., 1935, 77 F.2d 695, 698, 1935 A.M.C. 985, certiorari denied sub nom. Board of Commissioners of the Port of New Orleans v. North American Fruit & Steamship Corp., 296 U.S. 633, 56 S.Ct. 156, 80 L.Ed. 450, 1935 A.M.C. 1444. See also Griffin, The Federal Maritime Line Act, 37 Harv.L.Rev. 15 (1923), reprinted 1924 A.M.C. 206, and Gilmore & Black, Admiralty 542–43 (1957).

But neither this approach which must frequently lead to the allowance of maritime liens to new and infrequent situations, Krauss Bros. Lumber Co. v. Dimon Steamship Corp., 1933, 290 U.S. 117, 54 S.Ct. 105, 78 L.Ed. 216, 1933 A.M.C. 1578, nor the assumption that the act of dredging was a maritime activity of the dredge, Butler v. Ellis, 4 Cir., 1930, 45 F.2d 951, 1931 A.M.C. 77; McKie v. Diamond Marine Co., 5 Cir., 1953, 204 F.2d 132, 1953 A.M.C. 1409, makes this out to be a lien.

The lien is not here being asserted to cover the charge for a *service* rendered to the vessels. This would be the case were it for wharfage, or in this Bayou wilderness, vicarious wharfage for the *use* of the slip by the factory barges. Western Wave, supra. What is sought here is not the cost for the service, but rather the cost of constructing the capital facility by which that service is furnished or becomes available. This distinction is emphasized by the repeated use of the word "services" in the closing refrains of McDermott's brief as it urges a favorable contrast of this case with others cited by it. "Surely, Appellant's services were no less necessary to enable the subject vessels to earn their revenues, or 'freight,' than were the cooperage services,[1] stevedoring services,[2] canal services,[3] wharfage services,[4] fumigation services,[5] storage services,[6] travel services,[7] and kindred other services involved in the cases cited * * *."

The statutory concept of a maritime lien is phrased in broad generalities. The idea of "other necessaries" unavoidably calls for judicial application in equally broad terms. For example, this has been stated to be "what is reasonably needed in the ship's business," The Penn, 3 Cir., 1921, 273 F. 990, 991. And to determine this "regard must be had to the character of the voyage or the employment in which the vessel is being used." Walker-Skageth Food Stores, Inc. v. The Bavois, D.C.S.D.N.Y.1942, 43 F. Supp. 109, 110, 1942 A.M.C. 211, quot-

1. The Onore, D.C.E.D.N.Y.1873, 18 Fed. Cas. p. 728, No. 10,538.

2. The Henry S. Grove, D.C.W.D.Wash. 1922, 285 F. 60.

3. In Re Burton S.S. Co., D.C.D.Mass. 1925, 3 F.2d 1015, 1925 A.M.C. 335.

4. The Western Wave, supra.

5. The Susquehanna, D.C.D.Mass.1923, 3 F.2d 1014, 1923 A.M.C. 643.

6. The Artemis, D.C.S.D.N.Y.1931, 53 F. 2d 672, 1932 A.M.C. 195.

7. The Egeria, 9 Cir., 1924, 294 F. 791, 1924 A.M.C. 126.

**526**

ing from The Satellite, D.C.D.Mass.1910, 188 F. 717, 720. This means that the decision in individual cases cannot be a mere mechanical one of semantics. It must frequently be a matter of degree. In this light, while this berth was perhaps of operational indispensability to profitable activities of this unique flotilla, this is an effort to obtain a maritime lien for the cost of capital structures and facilities apart from the vessels. If it may be done for a slip, there is no reason why it may not be done for a wharf, if for a wharf, then the adjacent dock and warehouse shed, if for them, the essential railway switching tracks, the overhead cranes, the marine legs for grain and ore handling, banana elevators, railroad car derricks for seatrain vessels, or one hundred and one other such possibilities.

The effort to liken this to the cases of The Gulfport, 5 Cir., 1918, 250 F. 577, and The William Leishear, D.C.D.Md. 1927, 21 F.2d 862, 864, 1927 A.M.C. 1770, 1773, is unrealistic. Each of these involved liens for dredging out channels to free vessels then stranded high and dry after severe storms. As both opinions so plainly reflect these were essentially services in the nature of salvage. We characterized it thus in Gulfport: "A service rendered in restoring a vessel so placed to the element in which alone it is of use, from which it was forced by the violence of a storm, is of a nature to facilitate or render possible the continuance of its use as an instrument of navigation. * * *." 250 F. at page 580. Unless the services there involved were performed, the vessels would have ended their lives in an ignominious land-locked grave. Here the new slip facilitated the menhaden operation to be sure. But the continued life of the Fishing Factory No. 1 and ABL 123 as floating navigating vessels did not depend on it, as witness the departure of the vessels from the slip when they were towed to Appalachicola, Florida, after the collapse of Bankrupt's Louisiana operations.

Affirmed.