# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 14, 2024

Lyle W. Cayce
Clerk

No. 24-20399

John Bludworth Shipyard, L.L.C.,

*Plaintiff—Appellant*,

*versus*

Captain Frank Bechtolt, *Official No. 656965, Her Equipment, Appurtenances, Tackle, Etc., In Rem, also known as* The Dredge,

*Defendant*,

Manson Construction Company; Caillou Island Towing Company, Incorporated,

*Claimants—Appellees*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:22-CV-3540

_____

UNPUBLISHED ORDER

Before Southwick, Willett, and Oldham, *Circuit Judges*.

Per Curiam:

Our prior order denying the motion for stay pending appeal is WITH-DRAWN and the following order is SUBSTITUTED:

No. 24-20399

John Bludworth Shipyard, L.L.C. (JBS) seeks a stay pending appeal of the district court's order vacating the maritime arrest of the CIT-103, a barge owned by Caillou Island Towing Company, Inc.  On October 29, 2024, we denied the stay.  JBS filed a motion for reconsideration, which we GRANT.

In 2020, JBS performed nearly $3 million of work combining three vessels into a single elongated unit, one vessel joined to the bow and the other to the stern of the CIT-103 in the middle.  It was modified by JBS from a "flat unpowered deck barge" into a "booster barge," housing a booster pump that increased the efficiency of the dredging performed by the combined unit.  In the process, JBS installed various pieces of equipment on the CIT-103, including engines, fuel tanks, pumps, and electrical components.

JBS's client never paid for the work and filed for bankruptcy.  JBS then arrested each of the three vessels in the combined dredging unit to recover on maritime liens.  Caillou Island Towing Company, Inc., the owner of the CIT-103, moved in the district court to vacate the arrest of its barge.  The district court vacated the arrest, finding that JBS did not have a maritime lien on the CIT-103 because JBS did not provide "necessaries" to the CIT-103.  It reasoned that JBS's services did not serve the "particular function" of the CIT-103 specifically, but rather the overall goal of JBS's client more generally in creating a dredging unit.  Therefore, the services were not "necessaries" and JBS did not have a maritime lien on the CIT-103.

JBS has appealed that order under 28 U.S.C. § 1292(a)(3) and now seeks a stay pending the outcome of that appeal.  JBS asserts that if a stay is not granted, the dredging unit will be separated, greatly decreasing its value.

We apply four factors when determining whether to grant a stay pending appeal:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits;

(2) whether the applicant will be irreparably injured absent a stay;

(3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and

(4) where the public interest lies.

*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). The first two factors are the most important. *Nken v. Holder*, 556 U.S. 418, 434 (2009).

As to the first factor, JBS argues it has a maritime lien because it provided necessaries to the CIT-103. *See* 46 U.S.C. § 31342(a). Necessaries are defined by statute to include "repairs, supplies, towage, and the use of a dry dock or marine railway." 46 U.S.C. § 31301(4). This court has further defined necessaries as including "most goods or services that are useful to the vessel, keep her out of danger, and enable her to perform her particular function." *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 603 (5th Cir. 1986) (*en banc*). Repairs, which are included within the scope of necessaries, "include replacements, improvements and even the conversion of the vessel from one type to another as long as it is not so extensive as to amount to original construction." 2 Benedict on Admiralty § 38.

For example, the Supreme Court held that the conversion of a railroad barge into an amusement steamer constituted repairs. *New Bedford Dry Dock Co. v. Purdy* (*The Jack-O-Lantern*), 258 U.S. 96, 99–100 (1922). Had the work instead been categorized as the construction of a new vessel, no maritime lien would have arisen. *Id.* at 99. The Court remanded "to determine and enforce the rights of the parties."[1] *Id.* at 100. Perhaps *The Jack-O-*

---

[1] The only published decision by the district court after the Supreme Court remand resolved which of several other named claimants had maritime liens and also explained the priority of their claims to the funds resulting from the sale of the *Jack-O-Lantern* by the United States Marshal. *Jack-O-Lantern*, 282 F. 899, 899–90 (D. Mass. 1922). That decision made no explicit reference to the New Bedford Dry Dock claim, but it did hold

No. 24-20399

*Lantern* opinion could be read as holding only that the work was conducted pursuant to a maritime contract but not holding there was a maritime lien. Regardless, the Supreme Court held that the kind of work done on the barge was repairs. It also quoted the then-current version of the federal statute on maritime liens, which stated

> that any person furnishing *repairs*, supplies, or other necessaries, including the use of dry dock or marine railway, to a vessel, whether foreign or domestic, upon the order of the owner or owners of such vessel, or of a person by him or them authorized, shall have a maritime lien on the vessel . . . .

*Id.* at 98 n.1 (quoting Act of June 23, 1910, ch. 373, § 1, 36 Stat. 604) (emphasis added).[2] Repairs are one category of necessaries. Even if the Supreme Court did not so hold, we conclude that converting the railroad barge into an amusement steamer created a maritime lien. *Id.* at 99–100.

The district court found that the services JBS provided to the CIT-103 were not necessaries because they did not serve the particular function of that one vessel but rather the overall goal of JBS's client more generally. To do so, it defined the CIT-103's function as "to operate as a flat unpowered deck barge that loaded and transported equipment using a tugboat as motive power." The question we must answer is whether it was proper to

---

that materials and supplies furnished to the Jack-O-Lantern around the same time gave rise to maritime liens. *Id.* Some of those liens likely related to the conversion of the vessel.

[2] The revised statute authorizes maritime liens for necessaries in one section and defines necessaries as "repairs, supplies, towage, and the use of a dry dock or marine railway" in another section. 46 U.S.C. § 31342(a) (authorizing maritime liens for necessaries); 46 U.S.C. § 31301(4) (definition). We agree that "no substantive change from prior maritime lien law [was] intended." 2 Benedict on Admiralty § 35; *see also Maritrend, Inc. v. Serac & Co. (Shipping) Ltd.*, 348 F.3d 469, 470–71 (5th Cir. 2003).

4

consider only the prior function of the barge as opposed to considering how the work served a new function of the barge as part of a dredging unit.

In its analysis, the district court relied on two of this court's precedents discussing necessaries. In the first, a fuel company provided fuel as cargo to support vessels, which in turn served as "floating gas stations" for a different set of vessels. *Martin Energy Servs., L.L.C. v. Bourbon Petrel M/V*, 962 F.3d 827, 831 (5th Cir. 2020). We rejected the argument that this gave the fuel company a maritime lien on the support vessels, in part because it would "represent an unprecedented expansion" of the term "necessaries" to cover cargo in general. *Id.* at 832. Because the fuel was not used by the support vessels themselves, the fuel company had not provided those vessels with necessaries. *Id.* In the second case, a vessel lifted oil platform parts out of the water and lowered them onto barges as part of a project to decommission an oil rig. *Central Boat Rentals, Inc. v. M/V Nor Goliath*, 31 F.4th 320, 322 (5th Cir. 2022). Tugboats towed loaded barges away and brought back empty barges so that the heavy lift vessel could continue its task. *Id.* We again rejected the idea that this gave the tugboat companies a maritime lien on the heavy lift vessel, reasoning that the heavy lift vessel's particular function — to "raise and lower the platform components" — was not served by the tugboats ferrying barges back and forth. *Id.* at 324. The tugboats, of course, served the broader decommissioning project, but that overall project was not the heavy lift vessel's particular function. *Id.*

In both precedents, the relevant vessels were providing fuel or services that may have been necessaries for other vessels but not for themselves. The opinions do not undermine the principle we discussed about work that is done to change the function of a vessel, so long as the changes do not as to amount to original construction, is entitled to a maritime lien. 2 BENEDICT ON ADMIRALTY § 38. Consequently, we need not decide whether these services are "repairs," which are a subset of "necessaries," or fall only

within the broader category, because either creates a maritime lien. *The Jack-O-Lantern*, 258 U.S. at 99–100; 46 U.S.C. § 31342(a).

We accept the district court's focus that the repairs or necessaries more broadly must benefit the function of the CIT-103 itself in order for a maritime lien to apply to that vessel. In *The Jack-O-Lantern*, all the work was to the single vessel. Here, the work done to each vessel was to benefit the function of the new, triple-sized vessel. Each of the three vessels, though, had its own particular function in such a combination. Adding engines, fuel tanks, pumps, and electrical components to the CIT-103 allowed that vessel to perform its function. Had the modifications not been performed, the CIT-103 would have failed in its particular function. Whether a vessel is structurally joined to other vessels or not, its function may well be to work in conjunction with other vessels. The fact that the vessel's function includes coordinating with the functions of other vessels would not prevent a maritime lien from arising unless, perhaps, there is a physical joinder in such form as to amount to the construction of a new vessel. No one argues that here.

We recognize that the statutes authorizing maritime liens should be interpreted narrowly, or, as our caselaw puts it, *stricti juris*. *Valero Mktg. & Supply Co. v. M/V Almi Sun, IMO No. 9579535*, 893 F.3d 290, 292 (5th Cir. 2018). First, though, we are not extending maritime liens to a new situation; we view this case as a relatively straightforward application of *The Jack-O-Lantern*. Second, the purpose of *stricti juris* is to protect unsuspecting third-party creditors and purchasers from secret, unrecorded liens. *Atlantic & Gulf Stevedores, Inc. v. M/V Grand Loyalty*, 608 F.2d 197, 200–01 (5th Cir. 1979). Extending the scope of necessaries to cover cargo or indirect benefits, as in *Martin Energy* and *Central Boat Rentals*, could upset the reasonable expectations of a third-party creditor or purchaser. We deal here with work performed directly and publicly on the CIT-103 in a shipyard to allow it to serve a new purpose. A reasonable third-party creditor or purchaser would be on

notice of these services and the prospect of a maritime lien. We do not see our opinion as extending maritime liens into unchartered waters. Far from it. Failing to recognize a maritime lien here would mark an unjustified retreat from the circumstances in which one would be expected to arise. There are some slight differences from the norm, but the similarities far exceed them.

To summarize, regardless of whether the work on the CIT-103 itself was repairs under the principles established in *Jack-O-Lantern* or is seen more generally as necessaries for the new function of the vessel, JBS has made a strong showing that it has a maritime lien on the CIT-103.[3]

On the second and third factors for a stay, both parties demonstrate that they will suffer significant injury if we rule against them on this motion for a stay pending appeal. Absent a stay, JBS will be injured because the CIT-103 will soon be physically severed from its position in the middle of the dredging unit, greatly decreasing the value of the dredging unit and "all-but-guarantee[ing] that JBS would have no meaningful recovery on its maritime liens." On the other hand, if a stay is granted, Caillou would suffer substantial injury: it would not be able to use the CIT-103, and the vessel would suffer damage from the elements by remaining idle, as it has since it was arrested in April 2023. Both parties, then, would suffer injury that may well be described as irreparable. These two factors cancel each other in our analysis.

Regarding the fourth factor, JBS argues that the public interest favors the enforcement of valid, statutory maritime liens. Caillou counters that the public interest, of course, does not favor the enforcement of invalid maritime

---

[3] In the district court, Caillou raised other reasons why JBS did not have a maritime lien. The order on appeal concluded only that JBS did not provide the CIT-103 with necessaries, and we concern ourselves with only that portion of the analysis.

liens. Given our conclusion that JBS has made a strong showing that it is likely to succeed on the merits, the fourth factor weighs in favor of JBS.

The motion for reconsideration is GRANTED. We also GRANT a stay pending the appeal. We expedite the appeal to the next available oral argument panel for establishing a schedule for briefing and further action.

No. 24-20399

ANDREW S. OLDHAM, *Circuit Judge*, concurring in the judgment:

On October 29, 2024, I voted to grant a stay in this case. Many considerations went into that discretionary judgment. As to the merits, however, I think this case boils down to a three-premise syllogism.

Premise 1: Congress is presumed to know the Supreme Court's interpretations of statutory text. *See, e.g.*, *Cannon v. Univ. of Chicago*, 441 U.S. 677, 696–98 (1979). Thus, when Congress uses a statutory term previously interpreted by the Supreme Court, Congress presumably adopts that interpretation in the statute. *See ibid.*

Premise 2: The Supreme Court has interpreted the term "repair" to include the conversion of a ship from one use to another. In *New Bedford Dry Dock Co. v. Purdy* (*The Jack-O-Lantern*), 258 U.S. 96, 100 (1922), the Court held the conversion of a barge used to transport railroad cars into an amusement steamer constituted a "repair."

Premise 3: Sixty-six years after *The Jack-O-Lantern*, Congress used the term "repair" in the Commercial Instrument and Maritime Lien Act ("CIMLA"). Under CIMLA, a maritime lien arises where a person provides "necessaries" to a vessel. 46 U.S.C. § 31342(a). And CIMLA specifies that "necessaries" include "repairs." *Id.* § 31301(4). CIMLA constituted a recodification of the statute at issue in *The Jack-O-Lantern* and did not alter the meaning of "repairs." *See Maritrend, Inc. v. Serac & Co. (Shipping) Ltd.*, 348 F.3d 469, 471 (5th Cir. 2003) (finding that Congress "did not make any substantive changes to the law" when it recodified CIMLA in 1988); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 257 (2012) (such recodified statutes retain their previous meaning).

Conclusion: a "repair" under CIMLA includes the conversion of a ship from one use to another. The conversion of CIT-103 in this case was less drastic than the conversion of the Jack-O-Lantern. Therefore, the conversion

in this case constitutes a "repair" under CIMLA that gives rise to a maritime lien.

I would stop the analysis there. I respectfully concur in the judgment granting the stay.

No. 22-60566

DON R. WILLETT, *Circuit Judge*, dissenting:

This stay proceeding lies at the intersection of various doctrines of maritime law, featuring unique facts that make the question presented a close one: whether work joining a vessel to two others and adding equipment constitutes "necessaries" giving rise to a maritime lien on that vessel. The panel holds that it likely does. Respectfully, I see things differently and dissent.

\* \* \*

The Commercial Instruments and Maritime Liens Act provides that a maritime lien exists for "a person providing *necessaries* to a vessel on the order of the owner or a person authorized by the owner."[1] CIMLA does not define "necessaries." Instead, it provides an illustrative list: "'necessaries' includes repairs, supplies, towage, and the use of a dry dock or marine railway."[2]

Though we interpret CIMLA narrowly to avoid improperly extending the availability of maritime liens,[3] we construe the word "necessaries" rather broadly to mean "maritime services generally" that are "reasonably needed in the ship's business."[4] We have further defined necessaries as "most goods or services that are useful to the vessel, keep her

---

[1] 46 U.S.C. § 31342(a)(1), (2) (emphasis added).

[2] 46 U.S.C § 31301(4).

[3] *Valero Mktg. & Supply Co. v. M/V Almi Sun, IMO No. 9579535*, 893 F.3d 290, 292 (5th Cir. 2018).

[4] *J. Ray McDermott & Co. v. Off-Shore Menhaden Co.*, 262 F.2d 523, 525 (5th Cir. 1959) (citation omitted).

11

No. 22-60566

out of danger, and enable her to perform her particular function."[5] They are items useful "to vessel operations" and "necessary to keep the ship going."[6]

"A necessary is determined by the need *of the vessel*."[7] "We look to the 'particular function' and requirements of a ship to determine what is a necessary for that ship."[8]

The panel holds that the work JBS performed—modifying the CIT–103 vessel into a booster barge, using it as a platform for dredging equipment (including engines, fuel tanks, pumps, and electric components), and joining it with the other two vessels—was "necessaries." Respectfully, the panel and JBS overlook that we must consider "necessaries" with regard to the *particular function of the CIT–103*.

Our caselaw, including the cases cited by the district court and the panel, makes clear that focusing on the function of *the CIT–103 itself*, rather than the larger three-part-vessel operation, is the proper frame of reference for determining the "particular function" of the vessel and thus what is necessary for that vessel.[9] We have held that a maritime lien runs against a vessel only when "the good or service was provided for use *by the vessel*

---

[5] *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 603 (5th Cir. 1986) (en banc).

[6] *Gulf Marine & Indus. Supplies, Inc. v. Golden Prince M/V*, 230 F.3d 178, 180 (5th Cir. 2000); *Silver Star Enterprises, Inc. v. Saramacca M/V*, 82 F.3d 666, 668 (5th Cir. 1996) (quoting *Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co.*, 310 U.S. 268, 280 (1940)). *See also Gulf Marine*, 230 F.3d at 179–180 (noting that courts have denied maritime liens where the services provided "do not fit naturally into [the] list of traditional shore-to-ship goods and services.").

[7] *Martin Energy Servs., L.L.C. v. Bourbon Petrel M/V*, 962 F.3d 827, 832–33 (5th Cir. 2020). (emphasis added).

[8] *Cent. Boat Rentals, Inc. v. M/V Nor Goliath*, 31 F.4th 320, 323 (5th Cir. 2022) (quoting *Martin Energy*, 962 F.3d at 832–33).

[9] *See Martin Energy*, 962 F.3d at 829–33; *Cent. Boat Rentals*, 31 F.4th at 322.

12

*itself.*"[10] And we have held that the "particular function" of the vessel cannot be extended to mean the goal of the overall project in which the vessel participates.[11] Even if the services are of "operational indispensability" to the overall project, to give rise to a maritime lien, the services still must be necessary to *that vessel*'s business.[12]

These precedents do not, of course, address the distinct situation in this case. But they generally support the idea that proper frame of reference for the "particular function" is quite specific to the vessel. JBS and the panel's view of the CIT–103's particular function expands that frame too far. The equipment JBS installed on the CIT–103 was for the purpose of increasing dredging efficiency of the three-part barge—not for any use by the CIT–103 itself. The CIT–103 merely served as a platform to hold this equipment. JBS's work putting the equipment on the CIT–103 and joining it with the other two vessels was certainly in service of dredging. But dredging wasn't the business of the CIT–103, which continued to operate as a flat deck barge. Rather, it was the overall business goal of JBS's client, which was in charge of the dredging project. These services may have been operationally indispensable to JBS's client. But they weren't "necessaries" as to *the CIT–103*'s business as a flat-deck barge platform housing equipment, any more than cargo is "necessaries" as to a cargo ship.[13]

---

[10] *Martin Energy*, 962 F.3d at 833 (emphasis added) (holding "necessaries" doesn't include cargo).

[11] *Cent. Boat Rentals*, 31 F.4th at 324 (holding the "particular function" of a heavy lift vessel in oil rig decommissioning operation was raising and lowering platform components, and tugboats weren't necessary to that particular function).

[12] *See J. Ray McDermott*, 262 F.2d at 525 (finding services operationally indispensable to overall project but declining to validate maritime lien because the "continued life" of the particular vessel "did not depend on" those services).

[13] *See Martin Energy*, 962 F.3d at 832.

No. 22-60566

The panel adopts JBS's argument, which relies heavily on a 1922 Supreme Court decision, *The Jack-O-Lantern*.[14] In that case, the claimant was seeking to recover for work done under a contract to convert a car float barge into an amusement steamer.[15] It claimed a maritime lien under the 1910 version of CIMLA, which stated that "any person furnishing repairs, supplies, or other necessaries . . . to a vessel shall have a maritime lien."[16] The issue was whether the work constituted "repairs" or "original construction" for purposes of determining whether the contract was maritime and thus whether the district court had jurisdiction.[17] The Supreme Court held that the work was for repairs, not new construction, so the contract was maritime.[18] Therefore, "there was jurisdiction in the court below to determine and enforce the rights of the parties."[19] After finding jurisdiction, the Court did not itself "determine and enforce the rights of the parties."[20] Nor did it otherwise opine on whether there was a valid maritime lien or whether the repairs constituted "necessaries." It did not remand for judgment in favor of the shipyard, nor did it comment on how the dispute on the merits should be resolved.

JBS and the panel read *The Jack-O-Lantern* as holding that a vessel owner can subject itself to a maritime lien by employing services directly operating on a vessel to change its role and allow it to perform a new function.

---

[14] 258 U.S. 96 (1922).

[15] *Id.* at 98.

[16] *Id.* at 98 n.1.

[17] *Id.* at 98–100.

[18] *Id.*

[19] *Id.*

[20] *Id.*

14

But this reading puts more weight on *The Jack-O-Lantern* than that three-page opinion can bear.[21] It is correct that the Supreme Court held that conversion work transforming a barge for a new purpose constituted repairs. And it is correct that, under CIMLA, "necessaries" giving rise to a maritime lien includes repairs. Therefore, it is also correct that *The Jack-O-Lantern* implicitly held that work transforming a barge for a new purpose gives rise to a maritime lien. But *The Jack-O-Lantern*'s holding was just that—implicit—as JBS concedes in its motion for reconsideration. And we are "not bound by implicit jurisdictional assumptions made in earlier cases."[22] *The Jack-O-Lantern* thus cannot stand for the proposition that work changing a vessel's function always gives rise to a maritime lien.

Instead, *The Jack-O-Lantern* and this case answer two distinct questions, both independently necessary to determine whether a maritime lien exists.

The first question (the question answered in *The Jack-O-Lantern*) is whether the work done was repairs—in which case the contract was for maritime services and maritime jurisdiction exists—or construction of a new vessel—in which case maritime jurisdiction does not exist. This inquiry is focused on whether the contract has a "maritime character"—that is, whether it "reference[s] commerce or navigation."[23] The function of the

---

[21] Indeed, JBS hasn't cited any other cases that clearly support its reading of *The Jack-O-Lantern*.

[22] *BNSF Ry. Co. v. Fed. R.R. Admin.*, 105 F.4th 691, 697 n.4 (5th Cir. 2024); see also *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) ("[D]rive-by jurisdictional rulings . . . have no precedential effect." (citations omitted)).

[23] 1 BENEDICT ON ADMIRALTY § 187 (quoting *The Manhattan*, 46 F. 797, 799–800 (D. Wash. 1891)).

vessel is irrelevant in this analysis.[24] And it is undisputed here that JBS's work on the CIT–103 was repair work as opposed to new construction.

But we still must answer the second question before we can determine whether the maritime lien is valid: whether the repairs were "necessaries" under CIMLA. *The Jack-O-Lantern* did not answer this question. In contrast to question one, which explicitly eschews analysis of the vessel's function, our circuit's caselaw is clear that the "particular function" of the vessel is important to the "necessaries" inquiry.[25] *The Jack-O-Lantern*'s explicit rejection of a function analysis highlights that the CIMLA "necessaries" inquiry, which focuses on the particular function of the vessel, must be analyzed separately.

The panel's conflation of these two separate questions doesn't just over-extend *The Jack-O-Lantern*; it also flouts the plain text of CIMLA. The statute provides that a maritime lien exists for only for "a person providing *necessaries* to a vessel."[26] By that plain language, if the work cannot be considered "necessaries," it cannot give rise to a maritime lien. Repairs are included in the list of illustrative examples defining "necessaries."[27] But that doesn't mean that every type of repair constitutes a necessary. Since JBS's work wasn't providing "necessaries," as defined by the particular function of the CIT–103 and under our caselaw, it cannot give rise to a maritime lien,

---

[24] *See id.* (citing *The Jack-O-Lantern*, 258 U.S. at 99) ("The Supreme Court rejected the suggestion that the ultimate use to which a vessel would be devoted should determine whether a vessel's conversion should be regarded as a repair or as new construction.").

[25] *See Equilease*, 793 F.2d at 603 (citing 2 Benedict on Admiralty § 34); *Cent. Boat Rentals*, 31 F.4th at 323 (quoting *Martin Energy*, 962 F.3d at 832–33). Indeed, "particular function" is the standard both parties and the district court focused on.

[26] 46 U.S.C. § 31342(a)(1), (2) (emphasis added).

[27] 46 U.S.C § 31301(4).

even if it can be characterized as "repairs" as opposed to new construction under *The Jack-O-Lantern*.

True, the Tenth Circuit has held that "the existence of a maritime lien is synonymous with the scope of admiralty jurisdiction."[28] Taken at face value, that would mean that finding maritime jurisdiction because the work is repairs rather than new construction automatically means that a maritime lien exists. This decision, of course, is not binding on us. And, like *The Jack-O-Lantern*, the Tenth Circuit didn't opine on whether the work was "necessary" to the vessel for purposes of a maritime lien. Admiralty jurisdiction and maritime liens are correlative.[29] But the Supreme Court's answering of one jurisdictional question in *The Jack-O-Lantern* (whether work constituted repairs versus new construction) cannot be stretched so far to answer a separate jurisdictional question that the Court failed to even mention (whether repair work constituted "necessaries").

What's more, in the few instances we have cited *The Jack-O-Lantern*, we have never read it so broadly as JBS urges today. We have always taken *The Jack-O-Lantern* to mean that "Contracts for vessel repair services are traditionally treated as maritime" and give rise to federal maritime jurisdiction—but nothing more.[30] In fact, our decisions citing *The Jack-O-Lantern* have proceeded under the assumption that maritime subject-matter jurisdiction is not necessarily synonymous with a valid maritime lien, even in

---

[28] *Chase Manhattan Fin. Servs., Inc. v. McMillian*, 896 F.2d 452, 457 (10th Cir. 1997).

[29] *The Rock Island Bridge*, 73 U.S. 213, 215 (1867); *Leon v. Galceran*, 78 U.S. 185, 190 (1870).

[30] *See Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 549 (5th Cir. 2002), overruled on other grounds; *see also Campbell v. Loznicka*, 181 F.2d 356, 359–60 (5th Cir. 1950) (finding maritime jurisdiction because work changing a former Navy vessel to a yacht was repairs not new construction).

an *in rem* action. For example, in *Miami River Boat Yard, Inc. v. 60' Houseboat, Serial No. SC-40-2860-3-62*, after finding maritime subject-matter jurisdiction, we noted that the vessel was "*capable* of being subjected to a maritime lien"—not that it *was* subject to a valid maritime lien.[31] And in *Am. Shipbuilding & Dock Corp. v. John Rourke & Sons*, after finding subject-matter jurisdiction because the work was for repairs as opposed to new construction, we noted that "the admiralty court has jurisdiction to enforce a lien *for work and material necessary*."[32] We left open the question of whether the work and material *was* necessary and thus whether the lien was valid.

The binding holding of *The Jack-O-Lantern* tells us only that work converting the function of the vessel is "repairs as opposed to original construction," and in such a case there is maritime jurisdiction to determine the rights of the parties. That alone does not give rise to a maritime lien. *The Jack-O-Lantern* doesn't provide any further guidance on the determination of the rights of the parties or the specific question before us: whether such repair work constitutes "necessaries" under CIMLA. It thus cannot dictate the outcome here.

Even if we accept the panel's reading of *The Jack-O-Lantern*, it still isn't clear that JBS's services to the CIT–103 operated to change the vessel's role, allowing it to perform a new function and giving rise to a maritime lien. JBS's services making changes to the CIT–103 were not as drastic as the services converting the car float to an amusement steamer in *The Jack-O-Lantern*. In fact, the function of the CIT–103 as a flat-deck barge remained largely unchanged after JBS's work—it merely served as a *platform*

_____

[31] 390 F.2d 596, 597–97 (5th Cir. 1968) (emphasis added), overruled on other grounds.

[32] 4 F.2d 845, 845 (5th Cir. 1925) (emphasis added).

for equipment used in the dredging project. Housing equipment is more akin to carrying cargo, which we held in *Martin Energy* did not constitute necessaries, than it is to the full-scale vessel makeover that occurred in *The Jack-O-Lantern.*

And, of course, we still must ask whether JBS's work was in service of the CIT–103 itself.[33] Unlike in *The Jack-O-Lantern*, where the work transforming the vessel to an amusement steamer was for the benefit of the vessel itself independent of any other larger goal, JBS's work transforming the CIT–103 into a "booster barge" was intertwined with the larger goal of increasing the dredging efficiency of the larger three-part dredging vessel. That the CIT–103 was conjoined with two other barges is a significant distinction between *The Jack-O-Lantern* and this case. *Martin Energy* and *Central Boat Rentals* tell us that work in service of the larger goal rather than the ship itself, while important for profitability, isn't "necessary" enough to give rise to a maritime lien.

\*    \*    \*

The panel's analysis of the murky waters of our maritime lien caselaw is certainly a plausible reading. But I am "not left with a firm conviction that [the district court's] holding was erroneous,"[34] so I do not believe JBS has shown the likelihood of success necessary for a stay.

Respectfully, I dissent.

---

[33] *See Martin Energy*, 962 F.3d at 833.

[34] *United States v. Fluitt*, No. 22-30316, 2022 WL 3098734, at \*2 (5th Cir. Aug. 4, 2022).